ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 26 2005
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SWANSON GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-170C |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

**COUNT I**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609.

2. Plaintiff is Swanson Group, Inc. ("Swanson").

3. Swanson was formally known as Superior Lumber Co. having officially changed to its current name on March 7, 2002.

4. Defendant is the United States of America acting through the United States Forest Service, Department of Agriculture (the "Forest Service").

5. This action arises out of the Forest Service's deemed denial of Swanson's claim under the Contract Disputes Act, 41 U.S.C. § 601 et. seq. (the "CDA") for breach of the Forest Service's Benchmark timber sale contract, Contract No. 087202.

6. On July 12, 2004, Swanson submitted a properly certified claim letter to the contracting officer pursuant to the CDA, seeking the damages detailed herein and requesting a final decision within 60 days.

7. In a letter dated July 22, 2004, Brenda L. Woodard (the "contracting officer") acknowledged that the Forest Service had received Swanson's claim, and indicated that she would render a decision within 60 days, which would be September 11, 2004.

8. In a letter dated September 1, 2004, the contracting officer notified Swanson that she would not issue a final decision by September 11, 2004, and would instead issue a final decision in an additional 60 days, which would be November 10, 2004.

9. In a letter dated November 3, 2004, the contracting officer notified Swanson that she would not issue a final decision by November 10, 2004, and would instead issue a final decision in an additional 60 days, which would be January 8, 2005.

10. In a letter dated January 3, 2005, the contracting officer notified Swanson that she would not issue a final decision by January 8, 2005 and would instead issue a final decision in yet another 60 days, which would be March 9, 2005.

11. The contracting officer has not made a good faith attempt to issue a final decision.

12. Because the contracting officer neither issued a final decision within 60 days, nor issued a final decision within the time in which she has informed Swanson on multiple occasions that she would issue a final decision, the contracting officer failed to satisfy her obligations under Section 605(c)(2) of the CDA, and, as a result, under Section 605(c)(5) of the CDA, the contracting officer is deemed to have denied Swanson's claim, allowing Swanson to bring a suit on the claim in this Court.

13. The Benchmark timber sale involves the sale and harvest of certain timber located in the Umpqua National Forest in Oregon.

14. On July 22, 1997, the National Marine Fisheries Service ("NMFS") issued a Biological Opinion on the impacts of certain Forest Service timber sales, including the Benchmark sale, on certain listed, proposed and candidate species, pursuant to the Endangered Species Act ("ESA"). This Biological Opinion relied upon a Biological Assessment prepared by the Forest Service. The Biological Opinion concluded that these sales, including the Benchmark sale, "are not likely

to jeopardize the continued existence of the U.R. cutthroat trout or O.C. steelhead trout." Neither this Biological Opinion nor the Forest Service Biological Assessment substantiated this conclusion. Nevertheless, the Forest Service awarded the Benchmark sale to Swanson.

15. The Forest Service awarded the Benchmark timber sale contract to Swanson under Swanson's previous name (Superior) on October 23, 1997.

16. Swanson purchased the Benchmark sale as a source of supply for Swanson's timber mills. Swanson relied on the availability of the timber from that sale for that purpose.

17. Swanson began harvesting the Benchmark sale in April, 1998.

18. In a letter dated May 1, 1998, the Forest Service advised Swanson that all operations on the sale were suspended because the Biological Opinion upon which the Benchmark sale was premised had been invalidated by a decision issued on May 29, 1998, by Judge Rothstein of the District Court for the Western District of Washington in the case of Pacific Coast Federation of Fishermen's Association v. National Marine Fisheries Service, No. 97-CV-775, 1998 WL 1988556 ("PCFFA I"). Prior to the Forest Service suspending operations on the Benchmark sale, Swanson had removed approximately 175 thousand board feet (mbf) of timber from the sale.

19. In PCFFA I, a coalition of environmental groups challenged the sufficiency of certain Biological Opinions that had been issued by NMFS following consultation between NMFS and the Forest Service about the effects of Forest Service timber sales on certain aquatic species listed under the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.

20. In the challenged Biological Opinions, NMFS had determined that if the Forest Service complied with the Aquatic Conservations Strategy ("ACS"), both at the broad landscape level of planning and when implementing site-specific agency actions such as timber sales, the Forest Service's actions would not violate the ESA by jeopardizing the continued existence of the listed species and, therefore in NMFS's opinion, could proceed.

21. At all times relevant to this case, the Forest Service was obligated to ensure that its actions, including the Benchmark timber sale, did not violate the ESA which provides that:

> Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . .

16 U.S.C. § 1536(a)(2).

22. The ACS was a component of the Northwest Forest Plan. The Northwest Forest Plan was adopted by the Secretaries of Agriculture and Interior to address a variety of environmental issues within the range of the Northern spotted owl in the Pacific Northwest following the listing of that

species under the ESA. The adoption of the Northwest Forest Plan in 1994 amended the Land Management Plans of a number of National Forests, including the forest plan for the Umpqua National Forest which governed the Benchmark sale, to include, among other things, the ACS.

23. Pursuant to the National Forest Management Act, 16 U.S.C. § 472 et seq., the Benchmark sale was required to comply with the Plan, the ACS and the Umpqua National Forest Land Management Plan.

24. In PCFFA I, the District Court found that the Biological Opinions were invalid because the Biological Opinions issued by NMFS, working in tandem with the Forest Service, failed to demonstrate that individual timber sales, including the Benchmark sale, were in compliance with the ACS and the ESA. Accordingly, NMFS, and by necessary implication, the Forest Service, had not established that the Benchmark sale and other timber sales complied with the ACS and the ESA.

25. The Forest Service was a named defendant in PCFFA I.[1]

---

[1] The Bureau of Land Management ("BLM") was also a named defendant in PCFFA I and its timber sales and management plans were similarly subject to the ACS. However, the BLM's timber sales and management plans are not at issue in this action.

26. Following the Court's ruling, the Forest Service suspended a number of timber sales, including Benchmark, even though the Court had not issued an injunction or other court order directing it to do so.

27. Prior to award of the Benchmark timber sale to Swanson, the Forest Service knew or should have known that the Benchmark timber sale was not in compliance with the ACS or the ESA. By awarding the Benchmark timber sale and then subsequently suspending that sale in order to determine whether that sale complied with the ACS and the ESA, the Forest Service materially breached the Benchmark timber sale contract.

28. Because the Forest Service failed to design the Benchmark sale to ensure compliance with the ACS and the ESA, the Biological Opinion issued by NMFS did not and could not demonstrate that the Benchmark sale complied with the ACS and the ESA. The Forest Service therefore caused the suspension of the Benchmark sale and materially breached the contract.

29. Because the Forest Service failed to do the environmental analysis required in order to demonstrate that the Benchmark sale was consistent with the ACS and the ESA, the Biological Opinion covering the Benchmark was deemed invalid in PCFFA I and the Benchmark sale had to be suspended by the Forest Service until the sale's compliance with the ACS and the ESA could be verified. Thus, the Forest Service's failure to meet its pre-award obligation to ensure that the

sale was consistent with the ACS and the ESA caused the suspension of the Benchmark sale and materially breached the contract.

30. Because the Forest Service worked in tandem with NMFS in developing the Biological Opinion, which failed to demonstrate that the Benchmark sale was designed to comply with the ACS and the ESA, the Forest Service, as well as NMFS, was responsible for the invalidation of the Biological Opinion and the subsequent suspension of the Benchmark sale. Accordingly, the Forest Service materially breached the contract.

31. Prior to the award of the Benchmark timber sale to Swanson, the Forest Service knew or should have known that the NMFS's Biological Opinion and the Forest Service's Biological Assessment were invalid and that no reasonable determination had been made that the Benchmark timber sale was in compliance with the ACS or the ESA. By awarding the Benchmark timber sale and then subsequently suspending that sale in order to perform environmental analyses which should have been performed prior to award, the Forest Service materially breached the Benchmark timber sale contract.

32. Due to the Forest Service's material breaches of the Benchmark timber sale contract, Swanson was deprived of accessing the Benchmark sale timber to supply its mills and has incurred damages in the total amount of $116,261.81.

## COUNT II

33. Swanson incorporates and realleges herein paragraphs 1-32 of this complaint.

34. Additionally and in the alternative, pursuant to clause C6.25 of the Benchmark timber sale contract the Forest Service warranted that prior to award it had investigated the sale area and on the basis of its investigation and the Forest Service's knowledge at the time had included in the contract, identified on the sale area map, and otherwise identified on the ground, all measures adequate to protect the habitat of threatened, endangered and sensitive species. Clause C6.25 of the Benchmark timber sale contract indicates that at the time of award there were no areas requiring any such measures, and no such areas were identified to Swanson on the sale area map, elsewhere in the contract or on the ground prior to the award of the contract.

35. Notwithstanding the Forest Service's warranty in clause C6.25 of the Benchmark timber sale contract, at the time of award the Forest Service had no valid basis for warranting that all measures adequate to protect the habitat of threatened, endangered and sensitive species had been included in the contract and identified to Swanson.

36. Because prior to awarding the Benchmark timber sale contract the Forest Service had not completed all necessary environmental analyses or properly consulted with NMFS as contemplated by clause C6.25, the Forest Service was required to suspend the Benchmark timber sale in order to accomplish these tasks.

37. Prior to the award of the Benchmark timber sale contract the Forest Service knew or should have known that it did not have a valid basis for its warranty under C6.25 of the Benchmark timber sale contract, and therefore the Forest Service's subsequent suspension of that contract in order to perform the required environmental analyses and consultation constituted a material breach of the contract.

38. The Forest Service's breach of its warranty under C6.25 of the Benchmark timber sale contract and the suspension of the contract which resulted from that material beach caused Swanson to incur damages in the amount of $116,261.81.

**COUNT III**

39. Swanson incorporates and realleges herein paragraphs 1-32 above.

40. The Forest Service's suspension of the Benchmark timber sale contract was imposed on May 1, 1998, and was in place for almost six years, <u>i.e.,</u> until March 23, 2004, with the exception of a brief lifting of the suspension outside the normal operating season on December 12, 2001, only to be followed by a reinstatement of the suspension on December 28, 2001.

41. The ostensible purpose of the suspension was to permit the Forest Service time to consult with NMFS concerning whether the Benchmark timber sale contract complied with the ACS and would not jeopardize the listed aquatic species. The length of the time involved in the

suspension for this purpose was unreasonable in duration, and the Forest Service failed to undertake reasonable efforts to complete the required consultation within a reasonable timeframe.

42. Accordingly, in the alternative to Counts I and II, the unreasonable duration of the Forest Service's suspension of the Benchmark timber sale contract constitutes a further material breach of that contract and resulted in Swanson incurring damages in the amount of $116,261.81.

**COUNT IV**

43. Swanson incorporates and realleges herein paragraphs 1-32 above.

44. Additionally and in the alternative, Swanson alleges that the Forest Service materially breached the Benchmark timber sale contract by failing to compensate Swanson as required by clause C6.01, including interest on deposits, the cost of maintaining bonds during the suspension, and Swanson's costs of assuming its claim in the total amount of $4,816.69.

WHEREFORE, plaintiff respectfully requests that this Court:

(a) rule that the Forest Service breached the Benchmark timber sale contract by wrongfully suspending the Benchmark timber sale;

(b) overturn the Contracting Officer's denial of plaintiff's claim;

(c) award plaintiff all the damages it has suffered as a result of the Forest Service's wrongful suspension of the Benchmark timber sale, plus applicable interest in accordance with the Contract Disputes Act;

(d) award plaintiff its costs and attorneys' fees incurred in pursuing this action; and

(e) grant plaintiff such further relief as this Court deems just and proper.

Respectfully submitted,

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Alan I. Saltman
Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: January 26, 2005