# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SWANSON GROUP, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. 05-170C
consolidated with 05-171C
(Judge Smith)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY IN CONSOLIDATED CASE NO. 05-171C ("WHITECAP")

Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 22, 2006

# TABLE OF CONTENTS

**PAGE**


Table of Authorities ... ii

Index to Plaintiff's Appendix ... iv

Introduction ... 1

I. Standard of Review ... 1

II. Statement of Facts ... 2

A. The Adoption of Option 9 ... 3

B. The Rescissions Act ... 4

C. The Preparation and Sale of the Whitecap Contract Under the Rescissions Act ... 6

D. The Forest Service's Suspension of the Whitecap Contract ... 7

III. Argument ... 10

A. The Forest Service's Suspension of the Whitecap Contract to Comply With a Court Order Issued Under the ESA Was Contrary to the Rescissions Act and, Therefore, Breached the Forest Service's Obligations Under the Contract ... 10

B. Clause CT6.01(b) of the Whitecap Contract did not Authorize the Forest Service's Suspension ... 12

Conclusion ... 13

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Alsea Valley Alliance v. Dept. of Commerce,
358 F.3d 1181 (9th Cir. 2004) ....................9

Alsea Valley Alliance v. Evans,
161 F.Supp.2d 1154 (D. Or. 2001) ....................9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 422 (1986) ....................2

Brooks v. United States,
65 Fed.Cl. 135 (2005) ....................2

Hall v. Aqua Queen Mfg., Inc.,
93 F.3d 1548 (Fed.Cir. 1996) ....................3

Maintenance Eng'rs v. United States,
50 Fed.Cl. 399 (2001) ....................3

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ....................3

Nicholson v. United States,
29 Fed.Cl. 180 (1993) ....................2

Oregon Natural Resources Council v. Thomas,
92 F.3d 792 (9th Cir. 1996) ....................5, 11, 13

Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,
71 F.Supp.2d 1063 (W.D. Wash. 1999) ....................8

Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.,
265 F.3d 1028 (9th Cir. 2001) ....................8

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed.Cir. 1987) ....................2

The Ecology Center v. Castenada,
426 F.3d 1144 (9th Cir. 2005) .................... 10-11

Webster Univ. v. United States,
20 Cl.Ct. 429 (1990) ....................2

**STATUTES AND REGULATIONS**

16 U.S.C. § 1531 *et seq*. .......... *passim*

RCFC 56(a) .......... 1, ,2

**MISCELLANEOUS**

§ 2001 of Public Law 104-19 .......... 1

# INDEX TO PLAINTIFFS' APPENDIX

**Description** **P. App. Page**

Excerpts of "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl," dated April 13, 1994 ........ 1

Excerpts of Public Law 104-19 (July 27, 1995) "Making emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 20, 1995, and for other purposes" ........ 22

Excerpts from House of Representatives Report 104-124 (May 16, 1995) (Conference Report) ........ 33

Letter, dated May 16, 1996, from Don Ostby, Forest Supervisor, Umpqua National Forest to "Interested Part[ies]" re: completed Environmental Analysis for the Whitecap Timber Sale ........ 36

Decision Notice and Finding of No Significant Impact for Whitecap Timber Sale, dated June 28, 1996 ........ 37

Oregon Natural Resources Council v. Thomas, 92 F.3d 792 (9th Cir. 1996) ........ 42

Advertisement for Whitecap National Forest Service Timber Sale ........ 50

Forest Service FS-2400-14 Bid Form for Advertised Timber, dated September 20, 1996, for Whitecap Timber Sale ........ 51

Letter, dated October 31, 1996, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., awarding Whitecap Timber Sale, Contract No. 086931 ........ 55

Timber Sale Auction Bid Record for Whitecap Timber Sale, dated October 23, 1996 ........ 58

Excerpts from Forest Service Timber Sale Contract No. 086931, "Whitecap Timber Sale" ........ 62

Pacific Coast Fed. of Fishermen's Ass'ns. v. Nat'l. Marine Fisheries Serv., Order Granting Plaintiff's Motion for Preliminary Injunction and Denying Defendant's Request for Stay, No. C00-1757R (W.D. Wash. Dec. 7, 2000) ................................65

Memorandum, dated December 19, 2000, to Forest Supervisors, Northwest Forest Plan Forests from Harv Forsgren, Regional Forester, Pacific Northwest Region and Bradley E. Powell, Regional Forester, Pacific Southwest Region .............................75

Excerpts from "Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Production" in Swanson Group, Inc. v. United States, Nos. 05-170C, 05-171C (Fed. Cl. Feb. 6, 2006) ...................................................77

Letter, dated December 22, 2000, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: suspension covering Whitecap Timber Sale.......................................................................................................................81

Letter, dated December 12, 2001, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: Whitecap timber sale no longer subject to court's injunction.................................................................................................................82

E-mail, dated December 17, 2001, from Margaret "Peggy" Kain, Group Leader Forest Products and Vegetation, Pacific Northwest Region, to Karla K. Bird, et. al., re: "9th Circuit Stay of Judge Hogans [sic] Ruling"..................................................83

Letter, dated December 28, 2001, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: Whitecap timber sale "once again subject to the Court's injunction" ..............................................................................................84

Forwarded e-mail chain, last sent on March 9, 2004, from Greg Lesch, Planning and Products Staff Officer, Umpqua National Forest, to Brenda L. Woodard, re: "Alsea Valley Alliance (Oregon Coast coho listing case against NOAA): 9th Circuit dismisses ONRC's appeal for lack of jurisdiction;" including handwriting memorandum, initialed "BW".................................................................85

Letter, dated March, 23, 2004, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., allowing operations to proceed on Whitecap Timber Sale.......................................................................................................................90

Letter, dated April 26, 2004, from Brenda L. Woodard, Contracting Officer, to Superior Lumber Co., re: contract term adjustment pursuant to clause BT8.21 due to suspension under CT6.01 .........................................................................................91

Letter, dated June 1, 2004, from Gordon Culbertson, VP Resources, Swanson Group, Inc. to Brenda Woodard, re: Swanson's view that suspension was breach of contract and its subsequent actions are made without prejudice to this view ........ 92

Certified Claim Letter, dated July 12, 2004, from Swanson Group, Inc. to Brenda Woodard, Contracting Officer ........ 93

Plaintiff, Swanson Group, Inc. ("Swanson"), for the reasons set forth below, moves for summary judgment pursuant to Rule 56(a) of the Rules of the Court of Federal Claims. This motion is made solely with respect to the issue of liability for the Whitecap timber sale contract, which is the subject of case No. 05-171C in this consolidated action. In support of this motion Swanson relies on the instant brief, its Proposed Findings of Uncontroverted Fact, and its Appendix in Support if Its Motion for Summary Judgment on the Issue of Liability.

**Introduction**

On September 20, 1996, the Forest Service advertised the sale of the Whitecap timber sale contract located on the Umpqua National Forest within the State of Oregon. PPFUF 18. The advertisement expressly provided that the Whitecap contract is governed by § 2001 of Public Law 104-19, which is titled "Making emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 30, 1995, and for other purposes" (the "Rescissions Act"). PPFUF 19. The Rescissions Act wholly exempted certain timber sales, including Whitecap, from compliance with all federal environmental and natural resource management laws. PPFUF 1-17. Moreover, the Rescissions Act provided for a 15-day period of judicial review of timber sales under any other law, <u>i.e.</u>, laws not involving environmental or natural resource management. PPFUF 11. Thereafter, on October 26, 1996, Swanson bid on, and on October 31, 1996 was awarded, the Whitecap contract. PPFUF 21-24.

Even though the Rescissions Act mandated that the Whitecap contract was to proceed until completed without reference to environmental or natural resource law, in 2000 the Forest Service suspended the sale putatively to comply with a court order requiring consultation under Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, between the National Marine Fisheries Service ("NMFS") and the Forest Service. PPFUF 26-30. The Forest Service's suspension of the Whitecap timber sale remained in place for over three years even though, pursuant to the Rescissions Act, the Whitecap sale had been deemed to be in full compliance with the ESA for the life of the contract. PPFUF 29-39. Accordingly, the Forest Service's suspension was not only unnecessary to meet any obligation of the agency, but was also contrary to the Rescissions Act and, thus, a breach of the government's obligation to permit Swanson to cut and remove timber under the Whitecap contract. Swanson, therefore, respectfully requests that the Court enter summary judgment in its favor on the issue of liability as a matter of law.

## I. Standard of Review

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 422 (1986). "An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, while the materiality of the fact is determined by reference to applicable legal standards." Nicholson v. United States, 29 Fed.Cl. 180, 186 (1993), quoting Webster Univ. v. United States, 20 Cl.Ct. 429, 432 (1990) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562, 1567 (Fed.Cir. 1987)). An outcome-determinative fact is a material fact. Brooks v. United States, 65 Fed.Cl. 135, 140 (2005) (citing Liberty Lobby, 477 U.S. at 248). When the record could not lead a

rational trier of fact to find for the nonmoving party, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Maintenance Eng'rs v. United States, 50 Fed.Cl. 399, 408 (2001) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed.Cir. 1996).

## II. Statement of Facts

### A. The Adoption of Option 9

On April 13, 1994, the Secretaries of Agriculture and Interior executed the "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl" ("ROD"). PPFUF 1. The ROD put into place "Option 9" of a range of alternatives that had been prepared by federal land management agencies for guiding the future management of federal lands within the range of the northern spotted owl. PPFUF 5.[1] Among the goals of Option 9 is to "provide for a steady supply of timber sales and non-timber resources that can be sustained over the long term without degrading the health of the forest or other environmental resources." PPFUF 6. Under Option 9, however, some 78% of the federal lands within the range of the northern spotted owl, or 18.72 million acres, are entirely off-limits to traditional commercial timber harvest. PPFUF 6.

[1]The range of the northern spotted owl includes more than 24 million acres of federal lands within Northern California, Oregon and Washington. The federal lands are contained within 19 National Forests that are managed by the U.S. Forest Service and seven Management Districts that are managed by the Bureau of Land Management ("BLM"). PPFUF 2. The Forest Service's and BLM's authority to manage federal lands is provided for by Congress in several federal environmental laws, land management statutes and related regulations. PPFUF 3.

**B. The Rescissions Act**

On July 27, 1995, President Clinton signed into law Public Law 104-19, i.e., the Rescissions Act, which provides:

> (d) DIRECTION TO COMPLETE TIMBER SALES ON LANDS COVERED BY OPTION 9 – Notwithstanding any other law (including a law under the authority of which any judicial order may be outstanding on or after the date of the enactment of this Act), the Secretary concerned shall expeditiously prepare, offer and award timber sale contracts on Federal lands described in the [ROD].

PPFUF 8-9.[2] Moreover, the Rescissions Act provides that whatever environmental documents, if any, prepared by the Forest Service for timber sales offered under authority of the Rescissions Act shall be deemed to satisfy the requirements of all applicable Federal environmental and natural resource laws. PPFUF 10.

In addition to entirely relieving the Forest Service of any obligation to comply with federal environmental or natural resource law with respect to sales offered under the Rescissions Act, the Act further mandated that any legal challenge to timber sales offered on lands covered by Option 9 other than under federal environmental and natural resource management laws had to be filed in the district court where the subject federal lands are located within 15 days of the advertisement of the sale. PPFUF 11. Although the Forest Service's ability to offer timber sales under the provisions of the Rescissions Act expired on December 31, 1996, the Act provided that

[2]The ROD had been prepared and adopted against a backdrop of litigation, including three region-wide injunctions that had severely restricted new timber sale programs on federal forests within the range of the northern spotted owl for several years. PPFUF 4. By adopting Option 9 in the ROD, the Secretaries amended the planning documents for a number of national forests within the range of northern spotted owl, including the Umpqua National Forest within the state of Oregon, so as to bring those planning documents into compliance with Option 9. PPFUF 7.

its terms and conditions "shall continue in effect with respect to . . . timber sale contracts offered under subsection (d) until the completion of performance of the contracts." PPFUF 12.

The legislative history of the Rescissions Act demonstrates that a primary motivation for the Act was Congress' concern that the administration:

> has not made the necessary efforts to fulfill the commitment it made [in Option 9] to the people of the region to achieve an annual harvest level of 1.1 billion board feet and [members of the conference committee] have included bill language to assist the administration in this effort.

PPFUF 13. Additionally, the legislative history indicates that Congress had exempted timber sales on Option 9 lands from further environmental review due to the extraordinary level of environmental scrutiny to which the lands that were addressed in Option 9 had already been subjected. PPFUF 14.[3]

---

[3]Despite the unambiguous language of the Rescissions Act, the Forest Service's decision to offer timber sales as provided for in the Act was challenged in court. On July 31, 1996, the Court of Appeals for the Ninth Circuit, in affirming a ruling of the Oregon district court, held:

> <u>The Rescissions Act doesn't require any documents or procedures for Option 9 timber sales. The effect of subsection 2001(i), therefore, is to render sufficient under the environmental laws whatever documents and procedures, if any, the agency elects to use for an Option 9 sale.</u> The upshot is that, under Rescissions Act §§ 2001(d) and 2001(i), defendants' decision to proceed with the [sales], and all documents and procedures connected with those sales, were entirely consistent with all federal environmental and natural resource laws.

<u>Oregon Natural Resources Council v. Thomas</u>, 92 F.3d 792, 796 (9th Cir. 1996) (emphasis supplied). PPFUF 17.

### C. The Preparation and Sale of the Whitecap Contract Under the Rescissions Act

On May 16, 1996, the Forest Service sent a letter to interested parties advising them that the Forest Service had completed the Environmental Analysis for the Whitecap timber sale in order to provide the public "with an opportunity to comment on this proposal prior to [the Forest Service's] final decision." PPFUF 15. The letter also stated that "The Whitecap Timber Sale is subject to Public Law 104-19 (1995 Rescission Act). This means that the decision for this project cannot be appealed." Id.

On June 28, 1996, the Forest Supervisor for the Umpqua National Forest signed the Decision Notice and Finding of No Significant Impact for the Whitecap timber sale. That document provides that:

> [T]he Whitecap Timber Sale is located on lands covered by Option 9 of the "Record of Decision for Amendment to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl." Under provisions of subsection (e) of Public Law 104-19 [the Rescissions Act], this decision is not subject to appeal. . . .
>
> This decision is subject to judicial review only in the United States district court for the district in which the affected Federal lands are located. As required under Section (f)(1) of Public Law 104-19, any challenge to this project must filed in the district court within 15 days after advertisement of the sale.

PPFUF 16.

On September 20, 1996, the Forest Service placed advertisements soliciting sealed bids for the Whitecap timber sale contract on the Umpqua National Forest within the State of Oregon. The bids were to be opened on October 23, 1996, and followed immediately thereafter by oral bidding for the Whitecap contract. PPFUF 18. The advertisement for the Whitecap timber sale

notified the public that "This timber sale is governed by § 2001 of Public Law 104-19 [i.e., the Rescissions Act], which requires any legal challenge of this timber sale to be filed within 15 days of this advertisement." PPFUF 19. However, no legal challenge of the Whitecap sale was filed within the allotted 15-day time period and the bid opening took place as scheduled on October 23, 1996.

On October 23, 1996, Swanson (which at that time was known as Superior Lumber Co.) submitted a sealed bid for the Whitecap timber sale contract. PPFUF 21. The Forest Service opened the bids it had received for the Whitecap timber sale on October 23, 1996, and thereafter conducted oral bidding for the contract. PPFUF 22. Swanson was declared the high bidder on the Whitecap contract and on October 31, 1996 the Forest Service awarded the Whitecap timber sale, Contract No. 086931, to Swanson. PPFUF 23-24. Pursuant to the terms of the Whitecap contract, the Forest Service agreed to sell and permit Swanson to cut and remove 14,658 hundred cubic feet (ccf) of timber identified in the contract. PPFUF 25.

### D. The Forest Service's Suspension of the Whitecap Contract

On December 7, 2000, the U.S. District Court for the Western District of Washington in Pacific Coast Federation of Fishermen's Associations v. National Marine Fisheries Service, No. C00-175, enjoined 20 Biological Opinions that had been prepared by the National Marine Fisheries Service ("NMFS") under the ESA. PPFUF 26. Some of these Biological Opinions had been prepared in consultation between NMFS and the Forest Service under the ESA and assessed the effects of numerous Forest Service timber sales located across the Pacific Northwest on the Oregon coastal coho salmon, a species listed under the ESA. Id. The December 7, 2000

injunction expanded the scope of an earlier injunction that had been issued by the same district court finding that several other Biological Opinions did not comply with the ESA which was then pending on appeal at the Ninth Circuit. Id.; Pacific Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv., 71 F.Supp.2d 1063 (W.D. Wash. 1999).

In the wake of the December 7, 2000 ruling, on December 19, 2000 the Regional Foresters for Region 5 (California) and Region 6 (Washington and Oregon) of the Forest Service issued a joint letter to Forest Supervisors for forests subject to the Northwest Forest Plan advising them of the ruling, directing them to suspend active operations on timber sales pursuant to contract clause C6.01(b) and further directing the Forest Supervisors to notify timber contract purchasers, including the purchaser of Whitecap, of the ruling. PPFUF 27. By letter dated December 22, 2000, the Contracting Officer for the Whitecap sale notified Swanson that 20 Biological Opinions had been enjoined under the December 7, 2000 ruling, including the Biological Opinion for the Whitecap sale. PPFUF 29. In the wake of the December 7, 2000 ruling, the Forest Service purported to suspend Swanson's operations on the Whitecap contract under clause CT6.01(b), i.e., "to comply with a court order issued by a court of competent jurisdiction." PPFUF 27-28; see also Plaintiff's Appendix ("Pl. App.") at 10. As a result, the Whitecap sale remained suspended during the entire 2000 harvest season and into the 2001 harvest season. On September 5, 2001, the Ninth Circuit Court of Appeals issued its opinion in Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv., 265 F.3d 1028 (9th Cir. 2001), which affirmed the district court's determination that biological opinions issued for certain timber sales did not comply with the ESA. PPFUF 30.

However, on December 12, 2001, the Contracting Officer advised Swanson that the Oregon district court had issued an order setting aside the listing of the Oregon coast coho salmon under the ESA and, therefore, the Whitecap sale was no longer suspended. PPFUF 31; see also Alsea Valley Alliance v. Evans, 161 F.Supp.2d 1154, 1163 (D. Or. 2001). Just two days later, on or about December 14, 2001, the Ninth Circuit Court of Appeals issued a stay of the Oregon district court's decision. PPFUF 32. On or about December 17, 2001, officials in Region 6 of the Forest Service advised Forest Service employees, including the Contracting Officer for the Whitecap sale, that in light of the stay the Forest Service considered the coho to be listed under the ESA and that awarded sales should once again be suspended. PPFUF 32. Following this direction from the Regional Office, the Contracting Officer for the Whitecap sale issued a letter to Swanson dated December 28, 2001 advising that the suspension of the Whitecap sale remained in place. PPFUF 33. Accordingly, Swanson's operations that had been suspended during the entire 2001 harvest season also remained suspended throughout all of 2002 and 2003.

On February 4, 2004, the Ninth Circuit Court of Appeals dissolved its stay of the Oregon district court's order that the listing of the Oregon coast coho salmon had been unlawful. PPFUF 34; see also Alsea Valley Alliance v. Dept. of Commerce, 358 F.3d 1181 (9th Cir. 2004). On March 23, 2004, the Contracting Officer sent a letter advising Swanson that the stay had been dissolved and that operations could proceed on the Whitecap timber sale. PPFUF 36. By letter dated April 26, 2004, the Contracting Officer granted Swanson additional time within which to complete the Whitecap contract due to time lost during the Forest Service's suspension of operations. PPFUF 37. By letter dated June 1, 2004, Swanson accepted the additional time to

operate the contract, but expressly reiterated its view that the suspension had been a material breach of contract and again noted that any actions taken by it under the Whitecap contract were without prejudice to its position that the suspension had been a material breach of contract. Pl. App. 38.

With the limited exception of the period from December 12, 2001 to December 28, 2001, the Whitecap timber sale remained suspended by the Forest Service from December 22, 2000 to March 23, 2004 due to the Forest Service's unnecessary and unlawful attempt to ensure that the Whitecap sale was in compliance with the ESA. PPFUF 39. But for the suspension of the Whitecap timber sale contract, Swanson would have harvested the timber that remained on the sale area during the period of the suspension. PPFUF 40. As a result of being denied the timber from the Whitecap sale during the suspension, Swanson incurred damages and unanticipated additional costs. Id.

## III. Argument

### A. The Forest Service's Suspension of the Whitecap Contract to Comply With a Court Order Issued Under the ESA Was Contrary to the Rescissions Act and, Therefore, Breached the Forest Service's Obligations Under the Contract

The extent to which any federal agency is obligated to address environmental issues in carrying out its functions is established by Congress in federal law. Moreover, by virtue of Congress' ability to conduct oversight of an agency's administration of federal law as well as its ability to enact, repeal, and amend legislation, Congress retains the ability to modify the extent to which, if at all, an agency will comply with any environmental law. See, e.g., The Ecology

Center v. Castenada, 426 F.3d 1144, 1149-50 (9th Cir. 2005), and cases cited therein. As discussed above, in the Rescissions Act Congress directed the Forest Service to offer timber sales on federal lands covered by Option 9 of the ROD "notwithstanding" any environmental and natural resource laws for the life of the contracts. PPFUF 9-12, 17; Oregon Natural Resources Council, 92 F.3d at 796. Congress also limited the jurisdiction of the federal courts to review a timber sale's compliance with any other laws, i.e., laws other than those pertaining to the environment and natural resources. PPFUF 11; id. 92 F.3d at 796. That is, if a sale offered under the Rescissions Act had not been challenged on non-environmental grounds in the appropriate district within 15 days after the sale was advertised, the courts lacked jurisdiction to review the sale under any law for the life of the contract. PPFUF 11-12; id. 92 F.3d at 796.

Despite the express congressional direction contained in the Rescissions Act, it is undisputed that the Forest Service suspended Swanson's operations on the Whitecap sale as of December 19, 2000, purportedly to comply with a court order. PPFUF 27-33. Of course, because no suit had been brought against the Whitecap contract within the allotted 15-day time period, no court had jurisdiction to review the Whitecap sale's compliance with any law or regulation. PPFUF 11, 20; Oregon Natural Resources Council, 92 F.3d at 796. Moreover, the court order that the Forest Service was allegedly required to comply with had been issued by the District Court for the Western District of Washington. However, judicial review of timber sales offered under the Rescissions Act was limited to the U.S. District Court for the district in which the affected federal lands are located (PPFUF 11), and the Whitecap sale was located on the Umpqua National Forest, i.e., entirely within the district for the U.S. District Court for Oregon. PPFUF 18. Accordingly, under the provisions of the Rescissions Act the District Court for the

Western District of Washington could not have had jurisdiction with respect to the Whitecap contract for any purpose, at any time.

Additionally, the December 7, 2000 order pursuant to which the Forest Service allegedly suspended the Whitecap sale had been issued under the ESA (PPFUF 26-33), an environmental statute with which the Whitecap sale was deemed to be in compliance for the life of the contract. PPFUF 10, 12. Thus, under no circumstances could any alleged non-compliance with the ESA be a basis for suspending operations on the Whitecap sale. Thus, for all of the foregoing reasons, the Forest Service's suspension of Swanson's operations was both contrary to the Rescissions Act and breached the Forest Service's contractual obligation to allow Swanson to cut and remove timber from the Whitecap sale area.

**B. Clause CT6.01(b) of the Whitecap Contract did not Authorize the Forest Service's Suspension**

The government's December 19, 2000 suspension of Whitecap was imposed pursuant to CT6.01(b). PPFUF 27-29.[4] However, CT6.01(b) only authorizes a suspension where a "court of competent jurisdiction" has issued an order with which the Forest Service must comply. Here, no court had jurisdiction to review of the sufficiency of environmental documentation prepared for the Whitecap sale. That is, under subsections (d) and (i) of the Rescissions Act the

---

[4]Contract clause CT6.01(b) provides:

> INTERRUPTION OR DELAY OF OPERATIONS (6/90). Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer: . . . (b) To comply with a court order, issued by a court of competent jurisdiction [.]

Pl. App. 64.

environmental documentation, if any, that was in place at the time the Whitecap contract was offered for sale, was deemed to be sufficient under all environmental and natural resource laws and regulations, specifically including the ESA. PPFUF 10, 13, 14, 17. This was the well-settled meaning of the Rescissions Act within the Ninth Circuit since at least 1996. PPFUF 17; Oregon Natural Resources Council, 92 F.3d at 795. Therefore, no district court had jurisdiction to review the Whitecap contract's compliance with the ESA.

Moreover, under the Rescissions Act, only the district court of Oregon could ever have had jurisdiction over the Whitecap sale and then such jurisdiction only existed with respect to the sale's compliance with laws other than federal environmental and land management laws. PPFUF 11, 16; Oregon Natural Resources Council, 92 F.3d at 796. In fact, the jurisdiction of the district court for Oregon only arose if a suit specifically challenging the Whitecap sale on grounds other than federal environmental and land management law were filed within 15 days of the Whitecap sale having been offered. See id. No such suit was ever filed against the Whitecap sale, however. PPFUF 20. Accordingly, the December 7, 2000 order issued by the district court for the Western District of Washington to enforce the ESA in a case that was filed in 1999, i.e. some three years after the Whitecap contract had been offered in 1996, was clearly not issued by a court of "competent jurisdiction." In these circumstances, clause CT6.01(b) did not apply to authorize a suspension of the Whitecap contract.

**Conclusion**

In light of the foregoing, Swanson respectfully requests that the Court enter an order finding that the Forest Service's suspension of the Whitecap timber sale contract breached the

terms of that contract, enter summary judgment in Swanson's favor pursuant to RCFC 56(a) on the issue of liability, and grant such other and further relief as this Court deems appropriate.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 22, 2006