Survey and Manage: The standards and guidelines require land managers to take certain actions relative to rare species of plants and animals, particularly amphibians, bryophytes, lichens, mollusks, vascular plants, fungi, and arthropods. These include: (1) manage known sites of rare organisms; (2) survey for the presence of rare organisms prior to ground-disturbing activities; (3) conduct surveys to identify locations and habitats of rare species; and (4) conduct general regional surveys for rare species.

For many species and taxonomic groups, adequate survey techniques may not exist. The standards and guidelines provide an implementation strategy that includes a time line for developing protocols for the surveys and conducting the necessary survey work.

## D. Application of Decision

### 1. Application to Land and Resource Management Plans

This decision amends current land and resource management plans with additional land allocations and standards and guidelines. The management direction set forth in this decision is incorporated upon the effective date of our decision into all existing plans and regional guides and will also be incorporated in plans for forests and districts that do not currently have approved management plans. Development of future plans will be closely coordinated with other agencies and with the Regional Interagency Executive Committee.

#### a. Bureau of Land Management

**Districts With Resource Management Plans** -- This decision amends the resource management plans for those portions of BLM districts within the range of the northern spotted owl with approved resource management plans. The Redding Resource Area, the Arcata Resource Area, and the King Range National Conservation Area, all within the Ukiah District of California, have approved resource management plans.

**Districts Without Resource Management Plans** -- This decision amends management framework plans and timber management plans for those portions of BLM districts within the range of the northern spotted owl without approved resource management plans. The BLM districts without resource management plans are Coos Bay, Eugene, Medford, Roseburg, and Salem Districts and the Klamath Resource Area of the Lakeview District. The units that do not have approved resource management plans have issued draft resource management plans, and the draft environmental impact statements for those draft plans have

been supplemented by the Final SEIS. BLM will proceed with completing those plans in accordance with this decision.

### b. Forest Service

**Regional Guides** -- This decision amends the regional guides for those portions of the Pacific Northwest Region (Region 6) and the Pacific Southwest Region (Region 5) within the range of the northern spotted owl.

**National Forests With Forest Plans** -- This decision amends the forest plans for those portions of National Forests within the range of the northern spotted owl that have approved forest plans. The National Forests with adopted plans within the range of the northern spotted owl are the Gifford Pinchot, Mount Baker-Snoqualmie, Mount Hood, Olympic, Rogue River, Siuslaw, Siskiyou, Umpqua, and Willamette National Forests. National Forests partially within the range include the Deschutes, Okanogan, Wenatchee, Winema, Lassen, and Modoc National Forests.

**National Forests Without Forest Plans** -- This decision amends the unit plans and resource management plans for those portions of National Forests without approved forest plans within the range of the northern spotted owl. The National Forests within the range of the northern spotted owl without approved forest plans are the Klamath, Shasta-Trinity, Mendocino, and Six Rivers National Forests. These forests have issued draft forest plans, and the draft environmental impact statements for these draft forest plans have been supplemented by the Final SEIS. The Forest Service will consider the management direction adopted in this decision when completing those plans.

## 2. Relationship of Standards and Guidelines to Existing Plans

The existing land management plans contain many standards and guidelines that are not amended by this decision. Only those existing plan standards and guidelines in conflict with this decision are replaced. Where existing plans are more restrictive or provide greater benefits to late-successional forest related species than Attachment A, the existing plan standards and guidelines will continue. (Four exceptions to this rule are listed in Attachment A, p. C-3.)

For both Forest Service and BLM lands, an estimate of the probable quantity of forest products that may be offered for sale is provided in the Final SEIS. The allowable sale quantity for the existing forest plans and approved BLM resource management plans will be recalculated at the time of the next plan revision. The resulting allowable sale quantity for National Forests and BLM districts without approved management plans will be recalculated when the respective plans are adopted.

### 3. Application to Timber Sales

ıis record of decision does not provide final authorization for any timber sale, nor oes it compel that any timber sale be awarded. Rather, the decision amends arious Forest Service and BLM planning documents; timber sales offered ubsequent to the effective date of this Record of Decision must be consistent vith these amended planning documents. In addition, timber sales must undergo ppropriate site-specific analysis, and must comply with applicable regulatory equirements for public participation and administrative appeal.

Some previously-offered sales are located in late-successional reserves. If those sales proceed, the integrity of the late-successional reserves will not be substantially impaired, and the cumulative environmental effects of the sales will not be significantly different from the effects set forth in the Final SEIS. Between the Draft and Final SEIS, the size of late-successional reserves increased by 378,200 acres, to a total late-successional reserve acreage of 7,431,000. The amount of late-successional, old-growth habitat protected in various reserves (e.g., late-successional, riparian, and known owl activity centers in the matrix) increased by 240,900 acres, to a total of 6,864,100 acres. These increases more than offset the approximately 26,000 acres of previously sold and awarded or sold and unawarded sales located within proposed late-successional reserves. The late-successional and old-growth habitat in late-successional reserves that might be harvested (assuming that these areas meet ESA requirements) represents about one-third of one percent of the total of this habitat in reserves in the preferred alternative.

#### a. Timber Sales Awarded Prior to the Effective Date

Timber sales awarded prior to the effective date of this Record of Decision are not altered by this Record of Decision. At the time they were awarded, these timber sales were consistent with the planning documents then in effect, complied with the Endangered Species Act and other laws, and the environmental effects of these sales were considered as part of the baseline for the biological opinion for the Final SEIS.

Timber sales in key watersheds (as described in the Final SEIS) and inventoried roadless areas (as defined in the RARE II study) awarded prior to September 1993 were evaluated and adjusted, as needed, to eliminate or mitigate long-term, unacceptable effects on riparian and aquatic ecosystems. Sales were assessed to determine their effect on state water temperature standards, large woody debris, stream flow, sediment regime, aquatic organisms, and other aquatic resources. The criteria for this evaluation were developed by the scientific group assisting the implementation team. Since September 1993, sales awarded in proposed late-successional reserves have been limited to thinning and salvage, evaluated using

criteria developed by the scientific advisory group.

**b. Timber Sales Offered Subsequent to the Effective Date of the ROD**

Timber sales offered subsequent to the effective date of this Record of Decision must be consistent with the appropriate planning documents as amended by this Record of Decision. Where appropriate, timber sale planning documents may reference the analysis in the Final SEIS.

**c. Timber Sales Sold but Unawarded**

With one exception as described below, all planned and sold but unawarded timber sales were reviewed and adjusted as needed, following publication of the Draft SEIS, pursuant to the process described in paragraph (a) above. The review ensured that these sales would not prevent the attainment of the environmental objectives of the selected alternative.

The environmental effects of these timber sales were disclosed in site-specific NEPA documents and subsequent review. Some of these sales have subsequently been awarded and some have not yet been awarded.

This Record of Decision specifically provides that the remaining sales that have been offered but not awarded prior to the effective date of this Record of Decision, other than those sales referred to in paragraph (1) below, may be awarded after the effective date of this Record of Decision without further modification provided that they meet the requirements of the Endangered Species Act.

**(1) Timber Sales Sold, Unawarded but Enjoined**

Timber sales sold, unawarded, but enjoined prior to the effective date of the ROD have not been reviewed using the procedure described in paragraph (a) above, but must be consistent with the appropriate planning documents as amended by this Record of Decision. Where appropriate, timber sale planning documents may reference the analysis in the Final SEIS.

**d. Timber Sales Released from the Injunction in <u>Seattle Audubon Society v. Lyons</u>**

On March 24, 1994, the court in <u>Seattle Audubon Society v. Lyons</u> modified the injunction to allow 24 timber sales in northern spotted owl habitat to be sold and awarded. These sales will be adjusted to conform to the amended planning documents resulting from our decision unless they are awarded prior to the effective date of this Record of Decision.

### 4. Application to Other Contracts, Permits and Special Use Authorizations

As plan amendments, the management direction provided by our decision applies to new contracts, permits and special use authorizations as required by Forest Service and Bureau of Land Management planning statutes and regulations. The attached Standards and Guidelines that require adjustments to current contracts, permits, and special use authorizations will be applied in those cases where statutory or regulatory authority exists if the change is necessary to achieve the overall goals. In those cases where contracts, permits, or special uses may not be revised or amended prior to their expiration, the Standards and Guidelines will be applied at the time of renewal in a manner that reflects subsequent changes in the Standards and Guidelines, if any, if their application is necessary to achieve the overall goals. For many ongoing activities, we expect that current permit terms will be sufficient to meet the overall goals. We presume that currently existing and permitted ski areas will be allowed to continue under current permit terms.

### 5. Application to Research Activities

An important component of this decision is the facilitation of research activities to gather information and test hypotheses in a range of environmental conditions. Although research activities are among the primary purposes of adaptive management areas and experimental forests, this decision does not intend to limit research activities to these land allocations. Where appropriate, some research activities may be exempted from the standards and guidelines of this decision. However, every effort should be made to locate non-conforming activities in land allocations where they will have the least adverse effect upon the objectives of the applicable standards and guidelines. All research activities must meet the requirements of applicable federal laws, including the Endangered Species Act.

### 6. Relationship to Other Plans and Proposals

Standards and guidelines in plans that have been adopted for National Scenic Areas and Wild and Scenic Rivers continue to apply where they are more restrictive or provide greater benefits for late-successional species.

We expect and intend that the management direction and land allocations in this decision will constitute the federal contribution to the recovery of the northern spotted owl. We expect that future recovery plans for any listed species associated with the late-successional old-growth forest habitat in the Pacific northwest (including the final recovery plans for the northern spotted owl and the

marbled murrelet) will use the management direction adopted in this decision as a base from which to build a strategy for recovery.

The Fish and Wildlife Service is considering a proposal to issue a regulation under section 4(d) of the ESA that would revise the ESA protective measures for the northern spotted owl on certain non-federal lands. The proposal is intended to complement and be consistent with the management direction for federal lands provided in this decision. The Fish and Wildlife Service is preparing a separate EIS specifically to analyze the impacts of any revised 4(d) rule and alternatives. The effect of the proposed 4(d) rule (were it to be adopted as set forth in the scoping notice) has been considered under a contingency analysis in the Final SEIS. In turn, the Fish and Wildlife Service will consider this decision and Attachment A in making the final decision on the 4(d) rule.

The Forest Service and BLM have been engaged in a joint effort known as the "PACFish strategy" to develop a conservation plan to preserve and enhance stream habitat for wild anadromous fish stocks in the Pacific northwest on lands these agencies administer. The decision reflected in this ROD and Attachment A is consistent with the interim PACFish strategy, notice of which was recently published in the Federal Register. The Forest Service and BLM, in consultation with the Fish and Wildlife Service and the National Marine Fisheries Service (through the RIEC and REO), will review any information generated by the PACFish effort and determine whether subsequent changes to the standards and guidelines of planning documents are needed.

The Forest Service and BLM are also engaged in a joint effort known as the "Eastside Oregon and Washington Ecosystem Management Strategy Project" to assess the federal forest and old-growth ecosystems east of the Cascades Range. The eastside strategy project is being conducted separately from this decision because the conditions of the ecosystems east of the Cascades are substantially different from those west of the Cascades.

### 7. Relationship to Other Lands

While the influences of activities on lands administered by the Fish and Wildlife Service, National Park Service, and Department of Defense were considered in the assessment of cumulative impacts in the Final SEIS, this decision does not adopt new management direction for those lands. This decision does not establish direction or regulation for state, tribal, or private lands.

### B. Effective Date

This decision shall take effect 30 days after publication of notice in the Federal Register.

### C. Administrative Record

Planning records documenting the preparation and review of the Standards and Guidelines are available for public review at the BLM Reading Room in Portland, Oregon. An index to the planning record has been prepared and is available upon request. We have incorporated by reference copies of existing Forest Service and BLM planning documents and environmental impact statements.

### D. Signatures

By signing this Record of Decision together, we exercise our respective authorities over only those portions relevant to our authority.

Acting Secretary
Mike Espy, Secretary
U.S. Department of Agriculture

Dated: APR 13 1994

Bruce Babbitt, Secretary
U.S. Department of the Interior

Dated: APR 13

PUBLIC LAW 104–19—JULY 27, 1995

# EMERGENCY SUPPLEMENTAL APPROPRIATIONS FOR ADDITIONAL DISASTER ASSISTANCE, FOR ANTI-TERRORISM INITIATIVES, FOR ASSISTANCE IN THE RECOVERY FROM THE TRAGEDY THAT OCCURRED AT OKLAHOMA CITY, AND RESCISSIONS ACT, 1995

# Public Law 104–19
# 104th Congress

## An Act

July 27, 1995
[H.R. 1944]

Making emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 30, 1995, and for other purposes.

Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti-terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred at Oklahoma City, and Rescissions Act, 1995.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to provide emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 30, 1995, and for other purposes, namely:

## TITLE I—SUPPLEMENTALS AND RESCISSIONS

### CHAPTER I

### DEPARTMENT OF AGRICULTURE, RURAL DEVELOPMENT, FOOD AND DRUG ADMINISTRATION, AND RELATED AGENCIES

### DEPARTMENT OF AGRICULTURE

#### AGRICULTURAL RESEARCH SERVICE

(TRANSFER OF FUNDS)

Funds made available under this heading in Public Law 103–330 and subsequently transferred to "Nutrition Initiatives" are transferred to the Agricultural Research Service.

#### FOOD SAFETY AND INSPECTION SERVICE

For an additional amount for salaries and expenses of the Food Safety and Inspection Service, $9,082,000.

#### AGRICULTURAL STABILIZATION AND CONSERVATION SERVICE

SALARIES AND EXPENSES

For an additional amount for salaries and expenses of the Agricultural Stabilization and Conservation Service, $5,000,000.

MISSION SUPPORT

(RESCISSION)

Of the funds made available under this heading in Public Law 103-327, $32,000,000 are rescinded.

SPACE FLIGHT, CONTROL AND DATA COMMUNICATIONS

(RESCISSION)

Of the available balances under this heading in previous fiscal years, $43,000,000 are rescinded.

ADMINISTRATIVE PROVISIONS

(INCLUDING TRANSFER OF FUNDS)

SEC. 1008. The Administrator is authorized to acquire, for no more than $35,000,000, a certain parcel of land, together with existing facilities, located on the site of the property referred to as the Clear Lake Development Facility, Clear Lake, Texas. The land and facilities in question comprise approximately 13 acres and include a Light Manufacturing Facility, an Avionics Development Facility, and an Assembly and Test Building which shall be modified for use as a Neutral Buoyancy Laboratory in support of human space flight activities.

NATIONAL SCIENCE FOUNDATION

ACADEMIC RESEARCH INFRASTRUCTURE

(RESCISSION)

Of the funds made available under this heading in Public Law 103-327, $131,867,000 are rescinded.

CORPORATIONS

FEDERAL DEPOSIT INSURANCE CORPORATION

FDIC AFFORDABLE HOUSING PROGRAM

(RESCISSION)

Of the funds made available under this heading in Public Law 103-327, $11,281,034 are rescinded.

TITLE II—GENERAL PROVISIONS

EMERGENCY SALVAGE TIMBER SALE PROGRAM

16 USC 1611 note.

SEC. 2001. (a) DEFINITIONS.—For purposes of this section:

(1) The term "appropriate committees of Congress" means the Committee on Resources, the Committee on Agriculture, and the Committee on Appropriations of the House of Representatives and the Committee on Energy and Natural Resources, the Committee on Agriculture, Nutrition, and Forestry, and the Committee on Appropriations of the Senate.

(2) The term "emergency period" means the period beginning on the date of the enactment of this section and ending on September 30, 1997.

(3) The term "salvage timber sale" means a timber sale for which an important reason for entry includes the removal of disease- or insect-infested trees, dead, damaged, or down trees, or trees affected by fire or imminently susceptible to fire or insect attack. Such term also includes the removal of associated trees or trees lacking the characteristics of a healthy and viable ecosystem for the purpose of ecosystem improvement or rehabilitation, except that any such sale must include an identifiable salvage component of trees described in the first sentence.

(4) The term "Secretary concerned" means—

(A) the Secretary of Agriculture, with respect to lands within the National Forest System; and

(B) the Secretary of the Interior, with respect to Federal lands under the jurisdiction of the Bureau of Land Management.

(b) COMPLETION OF SALVAGE TIMBER SALES.—

(1) SALVAGE TIMBER SALES.—Using the expedited procedures provided in subsection (c), the Secretary concerned shall prepare, advertise, offer, and award contracts during the emergency period for salvage timber sales from Federal lands described in subsection (a)(4). During the emergency period, the Secretary concerned is to achieve, to the maximum extent feasible, a salvage timber sale volume level above the programmed level to reduce the backlogged volume of salvage timber. The preparation, advertisement, offering, and awarding of such contracts shall be performed utilizing subsection (c) and notwithstanding any other provision of law, including a law under the authority of which any judicial order may be outstanding on or after the date of the enactment of this Act. Contracts.

(2) USE OF SALVAGE SALE FUNDS.—To conduct salvage timber sales under this subsection, the Secretary concerned may use salvage sale funds otherwise available to the Secretary concerned.

(3) SALES IN PREPARATION.—Any salvage timber sale in preparation on the date of the enactment of this Act shall be subject to the provisions of this section.

(c) EXPEDITED PROCEDURES FOR EMERGENCY SALVAGE TIMBER SALES.—

(1) SALE DOCUMENTATION.—

(A) PREPARATION.—For each salvage timber sale conducted under subsection (b), the Secretary concerned shall prepare a document that combines an environmental assessment under section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)) (including regulations implementing such section) and a biological evaluation under section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)) and other applicable Federal law and implementing regulations. A document embodying decisions relating to salvage timber sales proposed under authority of this section shall, at the sole discretion of the Secretary concerned and to the extent the Secretary concerned considers appropriate and feasible, consider the environmental effects of the salvage timber

sale and the effect, if any, on threatened or endangered species, and to the extent the Secretary concerned, at his sole discretion, considers appropriate and feasible, be consistent with any standards and guidelines from the management plans applicable to the National Forest or Bureau of Land Management District on which the salvage timber sale occurs.

(B) USE OF EXISTING MATERIALS.—In lieu of preparing a new document under this paragraph, the Secretary concerned may use a document prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) before the date of the enactment of this Act, a biological evaluation written before such date, or information collected for such a document or evaluation if the document, evaluation, or information applies to the Federal lands covered by the proposed sale.

(C) SCOPE AND CONTENT.—The scope and content of the documentation and information prepared, considered, and relied on under this paragraph is at the sole discretion of the Secretary concerned.

(2) REPORTING REQUIREMENTS.—Not later than August 30, 1995, the Secretary concerned shall submit a report to the appropriate committees of Congress on the implementation of this section. The report shall be updated and resubmitted to the appropriate committees of Congress every six months thereafter until the completion of all salvage timber sales conducted under subsection (b). Each report shall contain the following:

(A) The volume of salvage timber sales sold and harvested, as of the date of the report, for each National Forest and each district of the Bureau of Land Management.

(B) The available salvage volume contained in each National Forest and each district of the Bureau of Land Management.

(C) A plan and schedule for an enhanced salvage timber sale program for fiscal years 1995, 1996, and 1997 using the authority provided by this section for salvage timber sales.

(D) A description of any needed resources and personnel, including personnel reassignments, required to conduct an enhanced salvage timber sale program through fiscal year 1997.

(E) A statement of the intentions of the Secretary concerned with respect to the salvage timber sale volume levels specified in the joint explanatory statement of managers accompanying the conference report on H.R. 1158, House Report 104–124.

(3) ADVANCEMENT OF SALES AUTHORIZED.—The Secretary concerned may begin salvage timber sales under subsection (b) intended for a subsequent fiscal year before the start of such fiscal year if the Secretary concerned determines that performance of such salvage timber sales will not interfere with salvage timber sales intended for a preceding fiscal year.

(4) DECISIONS.—The Secretary concerned shall design and select the specific salvage timber sales to be offered under subsection (b) on the basis of the analysis contained in the document or documents prepared pursuant to paragraph (1)

to achieve, to the maximum extent feasible, a salvage timber sale volume level above the program level.

(5) SALE PREPARATION.—

(A) USE OF AVAILABLE AUTHORITIES.—The Secretary concerned shall make use of all available authority, including the employment of private contractors and the use of expedited fire contracting procedures, to prepare and advertise salvage timber sales under subsection (b).

(B) EXEMPTIONS.—The preparation, solicitation, and award of salvage timber sales under subsection (b) shall be exempt from—

(i) the requirements of the Competition in Contracting Act (41 U.S.C. 253 et seq.) and the implementing regulations in the Federal Acquisition Regulation issued pursuant to section 25(c) of the Office of Federal Procurement Policy Act (41 U.S.C. 421(c)) and any departmental acquisition regulations; and

(ii) the notice and publication requirements in section 18 of such Act (41 U.S.C. 416) and 8(e) of the Small Business Act (15 U.S.C. 637(e)) and the implementing regulations in the Federal Acquisition Regulations and any departmental acquisition regulations.

(C) INCENTIVE PAYMENT RECIPIENTS; REPORT.—The provisions of section 3(d)(1) of the Federal Workforce Restructuring Act of 1994 (Public Law 103–226; 5 U.S.C. 5597 note) shall not apply to any former employee of the Secretary concerned who received a voluntary separation incentive payment authorized by such Act and accepts employment pursuant to this paragraph. The Director of the Office of Personnel Management and the Secretary concerned shall provide a summary report to the appropriate committees of Congress, the Committee on Government Reform and Oversight of the House of Representatives, and the Committee on Governmental Affairs of the Senate regarding the number of incentive payment recipients who were rehired, their terms of reemployment, their job classifications, and an explanation, in the judgment of the agencies involved of how such reemployment without repayment of the incentive payments received is consistent with the original waiver provisions of such Act. This report shall not be conducted in a manner that would delay the rehiring of any former employees under this paragraph, or affect the normal confidentiality of Federal employees.

(6) COST CONSIDERATIONS.—Salvage timber sales undertaken pursuant to this section shall not be precluded because the costs of such activities are likely to exceed the revenues derived from such activities.

(7) EFFECT OF SALVAGE SALES.—The Secretary concerned shall not substitute salvage timber sales conducted under subsection (b) for planned non-salvage timber sales.

(8) REFORESTATION OF SALVAGE TIMBER SALE PARCELS.—The Secretary concerned shall plan and implement reforestation of each parcel of land harvested under a salvage timber sale conducted under subsection (b) as expeditiously as possible after completion of the harvest on the parcel, but in no case

later than any applicable restocking period required by law or regulation.

(9) EFFECT ON JUDICIAL DECISIONS.—The Secretary concerned may conduct salvage timber sales under subsection (b) notwithstanding any decision, restraining order, or injunction issued by a United States court before the date of the enactment of this section.

(d) DIRECTION TO COMPLETE TIMBER SALES ON LANDS COVERED BY OPTION 9.—Notwithstanding any other law (including a law under the authority of which any judicial order may be outstanding on or after the date of enactment of this Act), the Secretary concerned shall expeditiously prepare, offer, and award timber sale contracts on Federal lands described in the "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl", signed by the Secretary of the Interior and the Secretary of Agriculture on April 13, 1994. The Secretary concerned may conduct timber sales under this subsection notwithstanding any decision, restraining order, or injunction issued by a United States court before the date of the enactment of this section. The issuance of any regulation pursuant to section 4(d) of the Endangered Species Act of 1973 (16 U.S.C. 1533(d)) to ease or reduce restrictions on non-Federal lands within the range of the northern spotted owl shall be deemed to satisfy the requirements of section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)), given the analysis included in the Final Supplemental Impact Statement on the Management of the Habitat for Late Successional and Old Growth Forest Related Species Within the Range of the Northern Spotted Owl, prepared by the Secretary of Agriculture and the Secretary of the Interior in 1994, which is, or may be, incorporated by reference in the administrative record of any such regulation. The issuance of any such regulation pursuant to section 4(d) of the Endangered Species Act of 1973 (16 U.S.C. 1533(d)) shall not require the preparation of an environmental impact statement under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)).

(e) ADMINISTRATIVE REVIEW.—Salvage timber sales conducted under subsection (b), timber sales conducted under subsection (d), and any decision of the Secretary concerned in connection with such sales, shall not be subject to administrative review.

(f) JUDICIAL REVIEW.—

(1) PLACE AND TIME OF FILING.—A salvage timber sale to be conducted under subsection (b), and a timber sale to be conducted under subsection (d), shall be subject to judicial review only in the United States district court for the district in which the affected Federal lands are located. Any challenge to such sale must be filed in such district court within 15 days after the date of initial advertisement of the challenged sale. The Secretary concerned may not agree to, and a court may not grant, a waiver of the requirements of this paragraph.

(2) EFFECT OF FILING ON AGENCY ACTION.—For 45 days after the date of the filing of a challenge to a salvage timber sale to be conducted under subsection (b) or a timber sale to be conducted under subsection (d), the Secretary concerned shall take no action to award the challenged sale.

(3) PROHIBITION ON RESTRAINING ORDERS, PRELIMINARY INJUNCTIONS, AND RELIEF PENDING REVIEW.—No restraining