United States Department of Agriculture
Forest Service

Umpqua National Forest
PO Box 1008
Roseburg, OR 97470
(503) 672-6601

---

REPLY TO: 2450

DATE: October 31, 1996

SUBJECT: Whitecap Timber Sale, Contract No. 086931

TO: Superior Lumber Co.
P.O. Box 250
Glendale, OR 97442

On October 23, 1996, you were the high bidder on the Whitecap Timber Sale, Contract No. 086931. Your company was cleared for award following an EEO Compliance Check. Therefore, award of the Whitecap Timber Sale is being made to you as of this date. Subsection CT8.63, Nondiscrimination in Employment, is in effect in this contract.

Enclosed are three copies of the contract. Please sign original and duplicate copies and return to us; the third copy is for your surety. (The original and duplicate copies will be the "A" portion only to reduce cost in mailing). The above and the attached list of documents will need to be completed and returned to us within 30 days from date of this letter.

As stated in the advertisement and on the bid form, you must make a down payment or transfer into this sale effective purchaser credit in the amount of $233,900.00. (Bill For Collection enclosed) within 30 days from date of this letter. <u>Only certified or cashier checks, bank or postal money orders, company check or effective purchaser credit will be accepted for the down payment due.</u> There is no extension of time permitted to make this down payment and to return the signed contracts with appropriate Performance Bond. Failure to make this down payment or provide purchaser credit and to return the contracts within the time allowed will be a breach of contract. In that event, your bid guarantee of $59,500.00 will be retained by the Government.

Your bid bond furnished at the time of sale will be returned to you after receipt of the contract, performance bond, and down payment.

As specified in CT6.3 of this contract, you must furnish this office with a written general plan of operation within 60 days of final award of this sale. ✓ Karen to Ted 11/13/96

In accordance with Special Provision CT6.1 of the Timber Sale Contract, I hereby designate the following Forest Service Representative for the administration of the Timber Sale Contract.

Dale Walker is designated as Forest Service Representative for all phases of sale activity. He is authorized to (a) receive notices in regard to performance under the contract, (b) take action in relation to this contract, and (c) be readily available to the area.

Terry Dean is designated as Engineering Representative in regard to specified road construction. He is authorized to (a) receive notices in regard to specified road construction, (b) take action in relation to specified road construction, including approval of minor changes in grade, alignment, or drainage structure installation as needed to obtain construction in substantial compliance with drawings, and (c) be readily available to the construction area.

Please furnish us with the names of the Purchaser's Representative who will be readily available to the area of operations and who is authorized to receive notices and take action in regard to performance under this contract (C6.1). Also, please furnish the name of your representative who is authorized to submit operating schedules.

If you have any questions about contract terms, feel free to contact Representatives of either the Ranger District or the Supervisor's Office.

Brenda L. Woodard

BRENDA L. WOODARD
Contracting Officer

Enclosures

cc: North Umpqua

| | Copies Enclosed | Instructions |
|---|---|---|
| Timber Sale Contract Corporation) | 3 | Sign and certify original and two (For copies. Return original and duplicate to Umpqua National Forest. One copy for your surety. |
| Performance Bond (SF-25) | 3 | To be signed and executed by purchaser and surety. Original and one copy to be returned to Umpqua National Forest. One copy to be kept by surety. |
| Bill For Collection (DOWN PAYMENT) | 2 | Purchaser to keep pink copy. Return white copy with payment to address shown on bill. Make remittance payable to Forest Service, USDA. |
| Instructions to Contractors, AD-425a. Applies to sales in excess of $10,000 only and Contractors Affirmative Action Plan for Equal Employment Opportunity under Executive Orders 11246 and 11375. AD-425a reverse. | 1 | Purchaser to keep. |
| R6-FS-2400-61, Domestic Processing of Included Timber Agreement | 5 | Purchaser must require each buyer of logs, etc. to complete. One copy to be sent to Umpqua National Forest. |
| General Plan of Operation (CT6.3) | 1 | Furnish this office within 60 days from the date of the contract. |

# TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON WHITECAP
(SALE NAME)

UMPQUA NATIONAL FOREST
North Umpqua RD

BID DATE October 23, 1996

**FLAT RATE

| SPECIES | SAW DF & O | NSAW ALL SPECIES | | | Weighted Average Bid is $40.55 | |
|---|---|---|---|---|---|---|
| VOLUME - (CCF) | 13,994 | 664 | | | Total CCF: 14,658 | |
| MINIMUM BID | $42.45 | $.42 ** | $ | $ | Appraised Value: $594,324.18 | |
| BIDDERS NAME | | | | | | |
| 1. Douglas Co. For. | 40.55 | | | 1 | 49 - | |
| 2. Scott Timber | rejected | | | 3 | 49.05 | |
| 3. Superior Lbr Co. | 40.75 | | | 1 | 50 - | |
| 4. Western Lbr. Co. | 40.60 | | | 3 | 50.05 | |
| 5. 1 | 41- | | | 1 | 51 - | |
| . 3 | 41.05 | | | 3 | 51.05 | |
| 7. 1 | 42 - | | | 1 | 52 - | |
| 8. 3 | 42.05 | | | 3 | 52.05 | |
| 9. 1 | 43 - | | | 1 | 53 - | |
| 10. 3 | 43.05 | | | 3 | 53.05 | |
| 11. 1 | 44 - | | | 1 | 54 - | |
| 12. 3 | 44.05 | | | 3 | 54.05 | |
| 13. 1 | 45 - | | | 1 | 55 - | |
| 14. 3 | 45.05 | | | 3 | 55.05 | |
| 15. 1 | 46 - | | | 1 | 56 - | |
| 16. 3 | 46.05 | | | 3 | 56.05 | |
| 17. 1 | 47 - | | | 1 | 57 - | |
| 18. 3 | 47.05 | | | 3 | 57.05 | |
| 19. 1 | 48 - | | | 1 | 58 - | |
| 20. 3 | 48.05 | | | 3 | 58.05 | |

INSTRUCTIONS: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

# TIMBER SALE AUCTION BID RECORD

)S RECEIVED ON WHITECAP (SALE NAME)

UMPQUA NATIONAL FOREST
North Umpqua RD

BID DATE October 23, 1996

**FLAT RATE

| SPECIES | SAW DF & O | NSAW ALL SPECIES | | | Weighted Average Bid is $40.55 |
|---|---|---|---|---|---|
| VOLUME - (CCF) | 13,994 | 664 | | | Total CCF: 14,658 |
| MINIMUM BID | $42.45 | $.42 ** | $ | $ | Appraised Value: $594,324.18 |
| BIDDERS NAME | | | | | |
| 1. 1 | 59 - | | 1 | 70 - | |
| 2. 3 | 59.05 | | 3 | 70.05 | |
| 3. 1 | 60 - | | 1 | 70.50 | |
| 4. 3 | 60.05 | | 3 | 70.55 | |
| 5. 1 | 61 - | | 1 | 71 - | |
| 3 | 61.05 | | 3 | 71.05 | |
| 7. 1 | 62 - | | 1 | 71.50 | |
| 8. 3 | 62.05 | | 3 | 71.55 | |
| 9. 1 | 63 - | | 1 | 72 - | |
| 10. 3 | 63.05 | | 3 | 72.05 | |
| 11. 1 | 64 - | | 1 | 72.50 | |
| 12. 3 | 64.05 | | 3 | 72.55 | |
| 13. 1 | 65 - | | 1 | 73 - | |
| 14. 3 | 66.05 | | 3 | 73.05 | |
| 15. 1 | 67 - | | 1 | 73.50 | |
| 16. 3 | 67.05 | | 3 | 73.55 | |
| 17. 1 | 68 - | | 1 | 74 - | |
| 18. 3 | 68.05 | | 3 | 74.05 | |
| 19. 1 | 69 - | | 1 | 74.50 | |
| 20. 3 | 69.05 | | 3 | 74.55 | |

INSTRUCTIONS: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

# TIMBER SALE AUCTION BID RECORD

'S RECEIVED ON WHITECAP (SALE NAME)

UMPQUA NATIONAL FOREST
North Umpqua RD

BID DATE October 23, 1996

**FLAT RATE

| SPECIES | SAW DF & O | NSAW ALL SPECIES | | | Weighted Average Bid is $40.55 |
|---|---|---|---|---|---|
| VOLUME - (CCF) | 13,994 | 664 | | | Total CCF: 14,658 |
| MINIMUM BID | $42.45 | $.42 ** | $ | $ | Appraised Value: $594,324.18 |

| BIDDERS NAME | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. | 1 | 75 - | | 1 | 80.05 | | |
| 2. | 3 | 75.05 | | 3 | 80.50 | | |
| 3. | 1 | 75.50 | | 1 | 80.55 | | |
| 4. | 3 | 76 - | | 3 | 81 - | | |
| 5. | 1 | 76.05 | | 1 | 81.05 | | |
| | 3 | 76.50 | | 3 | 81.50 | | |
| 7. | 1 | 76.55 | | 1 | 81.55 | | |
| 8. | 3 | 77 - | | 3 | 82 - | | |
| 9. | 1 | 77.05 | | 1 | 82.05 | | |
| 10. | 3 | 77.50 | | 3 | 82.50 | | |
| 11. | 1 | 77.55 | | 1 | 82.55 | | |
| 12. | 3 | 78 - | | 3 | 83 - | | |
| 13. | 1 | 78.05 | | 1 | 83.05 | | |
| 14. | 3 | 78.50 | | 3 | 83.50 | | |
| 15. | 1 | 78.55 | | 1 | 83.55 | | |
| 16. | 3 | 79 - | | 3 | 84 - | | |
| 17. | 1 | 79.05 | | 1 | 84.05 | | |
| . | 3 | 79.50 | | 3 | 85 - | | |
| 19. | 1 | 79.55 | | 1 | 85.05 | | |
| 20. | 3 | 80 - | | 3 | 86 - | | |

INSTRUCTIONS: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

TIMBER SALE AUCTION BID RECORD

)S RECEIVED ON WHITECAP (SALE NAME)

UMPQUA NATIONAL FOREST
North Umpqua RD

BID DATE October 23, 1996

**FLAT RATE

| SPECIES | SAW DF & O | NSAW ALL SPECIES | | | Weighted Average Bid is $40.55 |
|---|---|---|---|---|---|
| VOLUME - (CCF) | 13,994 | 664 | | | Total CCF: 14,658 |
| MINIMUM BID | $42.45 | $.42 ** | $ | $ | Appraised Value: $594,324.18 |

| BIDDERS NAME | | | | | |
|---|---|---|---|---|---|
| 1. | 1 86.05 | | 1 93 - | | |
| 2. | 3 87 - | | 3 93.05 | | |
| 3. | 1 87.05 | | 1 94 - | | |
| 4. | 3 88 - | | 3 94.05 | | |
| 5. | 1 88.05 | | 1 95 - | | |
| | 3 89 - | | 3 95.05 | | |
| 7. | 1 89.05 | | 1 96 - | | |
| 8. | 3 89.50 | | 3 96.05 | | |
| 9. | 1 89.55 | | 1 97 - | | |
| 10. | 3 90 - | | 3 97.05 | | |
| 11. | 1 90.05 | | 1 98 - | | |
| 12. | 3 90.50 | | 3 98.05 | | |
| 13. | 1 90.55 | | 1 99 - | | |
| 14. | 3 90.75 | | 3 99.05 | | |
| 15. | 1 90.80 | | 1 100 - | | |
| 16. | 3 91 - | | 3 100.05 | | |
| 17. | 1 91.05 | | | | |
| [illegible]. | 3 91.25 | | | | |
| [illegible]. | 1 92 - | | | | |
| 20. | 3 92.05 | | | | |

INSTRUCTIONS: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

| U.S. DEPARTMENT OF AGRICULTURE - FOREST SERVICE **TIMBER SALE CONTRACT** (Applicable to Sales to be Measured Before Felling) | | NAME OF PURCHASER SUPERIOR LUMBER CO. | |
|---|---|---|---|
| NATIONAL FOREST Umpqua | RANGER DISTRICT North Umpqua | REGION 6 | CONTRACT NO. 086931 |
| SALE NAME Whitecap | | SUBREGION Douglas-fir | AWARD DATE 10/31/96 / TERMINATION DATE March 31, 2002 |

The parties to this contract are The United States of America, acting through the Forest Service, United States Department of Agriculture, hereinafter called Forest Service, and Superior Lumber Co.[1] P.O. Box 250, Glendale, OR 97442

a corporation organized and existing under the laws of the State of Oregon hereinafter called Purchaser.

[2] Forest Service having advertised a sale at which either (1) Purchaser, whose required bid deposit is now held by Forest Service as an initial deposit, was the successful bidder, or (2) no bids were received and Purchaser having subsequently offered at least the minimum advertised price and made an initial deposit in the same amount as the bid deposit specified in the sale advertisement; and the parties hereto desiring to record their agreement; now therefore,

In consideration of the premises and the promises hereinafter contained, unless provided otherwise herein, Forest Service agrees to sell and permit Purchaser to cut and remove and Purchaser agrees to purchase, cut and remove Included Timber.

This contract consists of three Divisions: AT - Specific Conditions, BT - Standard Provisions, and CT - Special Provisions, together with Sale Area Map, Drawings and specifications for developments (if any) and such attachments as may be provided for in Division CT. Specific Conditions are numbered and apply to the Part, Section, Subsection, or Item of the Standard Provisions, as indicated hereunder. Other conditions of this contract are stated in Division CT- Special Provisions.

**IN WITNESS WHEREOF,** the parties hereto have executed this contract as of the award date.

**UNITED STATES OF AMERICA**

BY Brenda L. Woodard

Two Witnesses:[3]

Contracting Officer
(Title)

(Name)

(Address)

Superior Lumber Co.
(Purchaser)[4]

By Steven Swanson

(Name)

Steven D. Swanson, Vice President
(Title)

(Address)

P.O. Box 250, Glendale, OR 97442
(Business Address)

I,[5] Chantal J. Miller, certify that I am the Assistant Secretary of the corporation named as Purchaser herein; that Steven D. Swanson who signed this contract on behalf of Purchaser, was then Vice President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

Chantal J. Miller
Chantal J. Miller

CORPORATE SEAL[6]

(OVER)



FS 2400-6T, Page 101 (10/73)

Purchaser shall protect all known and identified historic or prehistoric sites during Purchaser's Operations. Purchaser shall immediately notify the Forest Service if damage occurs to any historic site, and immediately halt operations in the vicinity of the site, until Forest Service authorizes Purchaser to proceed. If such damage is negligently or willfully caused, Purchaser shall bear costs of investigation and restoration, provided that such payment shall not relieve Purchaser from civil or criminal remedies otherwise provided by law.

CT6.25# - PROTECTION OF HABITAT OF ENDANGERED, THREATENED, AND SENSITIVE SPECIES. (1/93) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973, as amended, or as sensitive by the Regional Forester under authority of FSM 2670, are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed, Forest Service may either cancel under CT8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known. Discovery of such areas by either party shall be promptly reported to the other party.

In the event of contract modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by Forest Service. Amount of reimbursement shall be determined by Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing. However, in no event may Current Contract Rates be reduced below Base Rates.

CT6.3 - PLAN OF OPERATION. (10/77) Within 60 days of final award of contract, Purchaser shall furnish Forest Service a written general plan of operation which shall be in addition to the annual operating schedule required under BT6.31. The plan shall set forth planned periods for and methods of road construction, timber harvesting, and completion of slash disposal, erosion control measures and other contractual requirements. Forest Service written approval of the plan of operation is prerequisite to commencement of Purchaser's Operations. Purchaser may revise this plan of operation when necessitated by weather, markets or other unpredictable circumstances, subject to the written approval of Forest Service. In the event of delays beyond the control of Purchaser which qualify for Contract Term Adjustment, the plan of operation shall be mutually adjusted as necessary to accommodate the adjusted contract period.

CT6.311 - PLAN OF OPERATION FOR ROAD CONSTRUCTION. (6/80). Annually,

<u>CT6.0</u> - <u>OPERATIONS.</u> (6/90) Purchaser agrees to conduct its operations under this contract and other related business activities in compliance with Federal, State, and local statutes, standards, orders, permits, or other regulations.

State and local environmental quality laws must be applicable to National Forest System lands. The contract shall govern if such laws conflict with or preclude performance of contractual requirements.

A conviction of, or a civil judgment for, any of the following offenses, shall be considered a breach of this provision and may result in termination of this contract pursuant to CT9.3:

(a) Theft, forgery, bribery, embezzlement, falsification or destruction of records, making false statements, or receiving stolen property, that is in any way connected with obtaining, attempting to obtain, selling, trading, or processing public timber.

(b) Fraud, criminal offenses, or violation of Federal or State antitrust laws, any of which occurred in connection with obtaining, attempting to obtain, or performing a public contract or subcontract;

(c) Threatening, resisting, intimidating, or interfering with Forest Officers engaged in, or on account of, the performance of their official duties involving the protection, improvement, or administration of National Forest System lands.

<u>CT6.01</u> - <u>INTERRUPTION OR DELAY OF OPERATIONS.</u> (6/90) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

FILED ENTERED
LODGED RECEIVED

DEC 07 2000 12/8/00

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; OREGON NATURAL RESOURCES COUNCIL; and UMPQUA WATERSHEDS, INC.,<br>Plaintiffs,<br>v.<br>NATIONAL MARINE FISHERIES SERVICE,<br>Defendant,<br>and<br>AMERICAN FOREST RESOURCE COUNCIL,<br>Defendant-Intervenor. | NO. C00-1757R<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANT'S REQUEST FOR STAY |

THIS MATTER comes before the court on a motion by plaintiffs Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, Oregon Natural Resources Council, and Umpqua Watersheds, Inc. (hereinafter collectively "PCFFA" unless

individually identified) for preliminary injunction. PCFFA asks the court to direct defendant National Marine Fisheries Service (hereinafter "NMFS") to withdraw 20 biological opinions regarding timber sales in the Pacific Northwest, alleging that the biological opinions were improperly issued and therefore invalid. NMFS opposes PCFFA's motion, and has asked the court to stay the instant litigation pending the Ninth Circuit's ruling on a closely related case. Having reviewed the pleadings filed in support of and in opposition to the motion, together with the relevant files, and being fully advised, the court finds and rules as follows:

## I. BACKGROUND

This is the third chapter in an ongoing saga surrounding NMFS' consultation process with respect to the Northwest Forest Plan (hereinafter "NFP"), a comprehensive management strategy designed to deal with spotted owl habitat in the northwest's old-growth forests.[1] A component of the NFP is the Aquatic Conservation Strategy (hereinafter "ACS"), which is designed to address the health and habitat quality of salmonid species found within the forests covered by the NFP. The ACS has four essential compo-

---

[1] The complete factual, legislative, and procedural background relevant to this case is fully set out in the court's Order Granting Plaintiff's Motion for Summary Judgment, published at 71 F. Supp.2d 1063 (W.D. Wa. 1999), and will not be repeated here. The court reports herein only those facts necessary to understand its ruling.

nents: 1) riparian buffers, or land reserves along streams subject to special management standards; 2) designation of key watersheds, sources of high quality water for at-risk fish species; 3) watershed analysis procedures to guide planning, monitoring, and restoration programs; and 4) long-term watershed restoration programs to improve the health of aquatic ecosystems. Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents, Exh. U to Hasselman Decl. at B-12. On March 18, 1997, NMFS promulgated a biological opinion on the NFP (the "NFP Biological Opinion") aimed at complying with the standards and guidelines laid down in the ACS, which provides in pertinent part that:

> (1) essential components of the . . . ACS objectives, watershed analysis, restoration, land allocations, and standards and guidelines, will be fully applied at the four spatial scales of implementation (region, province, watershed, and site or project); (2) management actions will comply with all applicable land allocations and standards and guidelines; and (3) management actions will promote attainment of the ACS objectives.

See NFP Biological Opinion, Exh. V to Hasselman Decl. at 38. A given project will be found not to jeopardize a listed species if these criteria are met, as NMFS recognized that a "pivotal issue in applying these criteria is determining whether proposed actions are properly designed and mitigated to ensure full attainment of ACS objectives." Id.

This court upheld the validity of the NFP Biological Opinion

in a previous litigation between these same parties, and found in it an obligation that individual projects undertaken under the NFP must be tailored to meet the ACS objectives. See PCFFA v. NMFS, No. 97-775R (PCFFA I) (finding, in addition, NMFS' assumption that associated government agencies, in particular the Bureau of Land Management and United States Forest Service, would act in accordance with the ACS justified). In that same opinion, the court invalidated two site specific biological opinions because they did not adequately address site specific compliance with ACS standards.

The court had occasion to address four more NMFS biological opinions, issued with respect to the Umpqua Basin and the resident cutthroat trout and Oregon coastal coho, in PCFFA v. NMFS, 71 F. Supp.2d 1063 (W.D. Wa. 1999) (PCFFA II). There, the court determined that NMFS had erred during its consultation process by 1) measuring ACS compliance only on the watershed scale, rather than at the site-specific level; 2) failing to consider short-term impacts in its jeopardy determinations; and 3) failing to insist on strict compliance with ACS riparian reserve standards. Moreover, by failing to fully incorporate the recommendations contained in its expert panel's watershed analyses, NMFS was found to have violated the best scientific information rule of the Endangered Species Act ("ESA"), 16 U.S.C. §1536. See generally PCFFA II, 71 F. Supp.2d at 1068-73. This failure "has virtually guaran-



AO 72
(Rev 8/82)

teed that no timber sale will ever be found to jeopardize the continued existence of the [listed species]." Id. at 1073. The court concluded that, "[b]y employing a long term/watershed approach in making jeopardy determinations [and] . . . failing to require the action agencies to rely on and adequately incorporate watershed analysis into their biological opinions," NMFS had acted in an arbitrary and capricious manner under the Administrative Procedures Act, 5 U.S.C. §706. Id. NMFS' appeal from that decision is currently pending before the Ninth Circuit Court of Appeals.

NMFS issued the 20 biological opinions challenged in the instant suit following the same consultation guidelines invalidated by the court in PCFFA II. PCFFA, after unsuccessful attempts to deal with NMFS directly, brought this motion for a preliminary injunction preventing NMFS from acting on the biological opinions pending the Ninth Circuit's ruling on the appeal in PCFFA II and NMFS's compliance therewith. NMFS agrees that the issues in this case will be resolved by the Ninth Circuit's ruling, but has requested that the court stay this litigation until that resolution is handed down.

## II. DISCUSSION

### A. Preliminary Injunction Standard

The traditional test for a preliminary injunction requires



AO 72
(Rev 8/82)

the moving party to show either 1) a combination of likely success on the merits and the possibility of irreparable injury; or 2) that serious questions as to the merits are raised and that the balance of hardships tips sharply in the moving party's favor. Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987). Under this scheme, the requisite likelihood of success on the merits that must be demonstrated is inversely proportional to the requisite degree of irreparable injury. See Dr. Suess Enterprises, L.P v. Penguin Books USA, Inc., 109 F.3d 1394, 1396 (9th Cir. 1997). An additional consideration is whether the public interest favors the injunction sought. Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988). A plaintiff presenting claims under the ESA has a reduced burden of showing harm and that the public interest favors the injunction, because the ESA evidences congress's intent that the balance of hardships and the public interest normally tip sharply in favor of the endangered species. See Tennessee Valley Authority v. Hill, 437 U.S. 153, 193-94 (1978); National Wildlife Federation v. Burlington Northern R.R., Inc., 23 F.3d 1508, 1510-11 (9th Cir. 1994). Nevertheless, some showing of harm is still necessary in an ESA case. National Wildlife Federation, 23 F.3d at 1510.

B. Likelihood of Success on the Merits

PCFFA argues that the 20 biological opinions it is currently challenging were issued according to the same consultation guide-

lines which this court found arbitrary and capricious in PCFFA II, thus evidencing a strong likelihood of success on the merits of its case. NMFS does not dispute that characterization, but seeks to distinguish this case from PCFFA II on the grounds that different geographic regions and salmonid species are at issue here. That distinction is meaningless where, as here, the validity of NMFS' decision making processes, not just the individual decisions themselves, are at issue.

Furthermore, NMFS' opposition to PCFFA's motion for preliminary injunction is dedicated to convincing the court that its prior ruling is incorrect. Predictably, the court disagrees. There is no dispute that, in the instant opinions, NMFS has again 1) failed to measure project impacts on the site specific scale, instead reviewing for compliance with ACS guidelines on a watershed level; 2) ignored short term effects that would not be measurable ten or more years after the action; 3) failed to fully implement applicable watershed analyses prepared by its own expert panel; and 4) not insisted on strict compliance with ACS riparian reserve standards without justifying its departure. These actions were held to violate the APA and ESA in PCFFA II. NMFS has made no showing that the court's prior ruling is in error, or that these opinions are somehow not governed by the ruling in PCFFA II. The court therefore finds that PCFFA's likelihood of success on the merits of the instant case is exceedingly strong.

C. Harm

PCFFA claims irreparable harm exists in that NMFS cannot ensure that listed species will not be jeopardized by the projects subject to the biological opinions in dispute because the consultation process itself is flawed. Relying on Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985), PCFFA argues that, given "a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA." See Thomas, 753 F.2d at 764.

NMFS responds that the requested injunction is unnecessary and improper because PCFFA has made no showing that the fish species of concern will actually suffer if an injunction is not issued. NMFS also appears to rely on the substantial inconvenience an injunction would work on third parties, and on the fact that an injunction would prevent a number of non-timber sale activities that had been approved in the subject biological opinions. These non-timber activities include road maintenance and decommissioning, erosion control projects and widespread trail upkeep. NMFS argues that an injunction preventing these non-timber activities would be more harmful than allowing action under the 20 biological opinions to proceed. On the basis of this purported favorable balance of harms, NMFS asks the court to stay this litigation and leave it free to act on the biological opinions until the Ninth Circuit rules on the PCFFA II appeal. NMFS's

request for a stay thus presents essentially the same issue as PCFFA's request for an injunction.

While the court is mindful of the complications an injunction will likely work on NMFS's management activities, that inconvenience is not nearly sufficient to outweigh the immediate threat posed by biological opinions that were, most likely, improperly issued. There is a discrete and immediate harm posed to listed species by logging and timber activities undertaken pursuant to biological opinions that fail to properly assess the potential environmental harm associated with such forestry actions. NMFS cannot avoid the obligation to assess short term, site level impacts contained in the NFP Biological Opinion simply because it included detrimental and rehabilitative activities within a single biological opinion on an individual project.

In sum, the court finds that the possibility of irreparable harm exists on the facts of this case. Moreover, the balance of hardships, and certainly the public interest, tip sharply in favor of PCFFA in its attempt to enforce the provisions of the NFP and the ESA. Because more harm will flow from staying this action than will flow from staying NMFS's activity under the challenged biological opinions, NMFS is not entitled to a stay of this litigation.

/ / /

/ / /



AO 72
(Rev.8/82)

III. CONCLUSION

For the foregoing reasons, the court finds that PCFFA is entitled to a preliminary injunction during the pendency of NMFS's case before the court of appeals. The court therefore enjoins NMFS from taking any action on the challenged opinions until the Ninth Circuit issues its mandate on the PCFFA II appeal. The injunction against NMFS shall remain in place until such time as NMFS is in compliance with the Ninth Circuit's decision. NMFS's motion for a stay pending the outcome of PCFFA II is DENIED.

DATED at Seattle, Washington this 7th day of December, 2000.

Barbara J Rothstein

BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE



AO 72
(Rev 8/82)