Swanson Group, Inc.
PO Box 250 • 2695 Glendale Valley Road • Glendale, OR 97442 • Phone: (541) 832-1121 • Fax: (541) 832-1139

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

July 12, 2004

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**No. 7003-3110-0003-2638-2852**

Brenda L. Woodard
Contracting Officer
Umpqua National Forest
2900 NW Stewart Parkway
Roseburg, OR 97470

Re: Whitecap Timber Sale Contract (Contract No. 086931)

Dear Ms. Woodard:

Pursuant to the Contract Disputes Act, Swanson Group, Inc. ("Swanson"), formerly known as Superior Lumber Company,[1] hereby submits the following claim regarding the above-referenced contract in the amount of $786,077.08 plus interest from the date of your receipt of this letter. This claim is for damages incurred by Swanson as a direct result of the Forest Service's suspension of the Whitecap timber sale contract, which constituted a material breach of the contract.

[1] Superior Lumber Company officially changed its name to Swanson Group, Inc. on March 7, 2002.



Dimension Lumber
Lumber Sales: (541) 832-1218
Lumber Sales: (541) 832-1222
Lumber Sales: (541) 832-1241
Sales Fax: (541) 832-1232

Stud Lumber
Stud Sales: (541) 832-1145
Stud Fax: (541) 832-1235

Veneer
Plywood Sales: (541) 832-1175
Veneer & Plywood Fax: (541) 832-1177

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

As you know, we commenced harvesting operations on the Whitecap timber sale in November of 1997 and removed timber continuously thorough June of 1998. We resumed operations on the sale in 1999, removing approximately 1,300 mbf of timber. However, by letter dated December 22, 2000, we were advised that the biological opinion upon which the sale was premised had been enjoined by the court in Pacific Coast Federation of Fishermen's Association et al v. National Marine Fisheries Service (PCFFA III). This letter stated that the injunction was to remain in place until the Ninth Circuit ruled in a related case, PCFFA II. We understood this letter to be a suspension of the Whitecap timber sale.

By a letter dated March 23, 2004, we were informed that, due to a Ninth Circuit ruling on February 24, 2004 regarding the listing of the Oregon coast coho salmon, the Whitecap timber sale was "no longer subject to a previous court injunction. . . ."[2] It is our understanding that this

[2]This ruling was the latest in a series of decisions related to the Oregon coast coho salmon and affecting the Whitecap sale. Previously, by letter of December 12, 2001, we were advised that in light of a September 2001 ruling by the U. S. District Court for the District of Oregon in Alsea Valley Alliance v. Evans, No. 99-6265, setting aside NMFS's listing of the Oregon coast coho salmon under the Endangered species Act, the Whitecap timber sale no longer required a biological opinion and was therefore no longer subject to the injunction under PCFFA III. We took this letter as the lifting of the suspension imposed by the Forest Service nearly a year earlier.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

letter has lifted the suspension of the Whitecap timber sale, which lasted over three years. The Forest Service's suspension of performance constituted a breach of its implied duties to cooperate and not to hinder our performance and a breach of the Whitecap timber sale contract. Even assuming that the Forest Service had some authority to suspend our operations in these circumstances (something that we do not believe is the case), it also retained an obligation to exercise that suspension authority reasonably, which it did not do, thereby breaching the contract.

We were relying on timber from the Whitecap sale to supply logs to our mills in the 3rd and 4th quarters of 2002 and 2003. As a result of being denied the timber from the Whitecap sale at the time that we planned to harvest it, as well as timber from other federal contracts, Swanson was forced to seek out alternative sources of timber. We also incurred various unanticipated additional costs.

---

This lifting was short lived, however, and the sale was quickly re-suspended. By letter dated December 28, 2001, you advised us that the Ninth Circuit had issued a stay of the District Court's order in Alsea Valley Alliance v. Evans and that Whitecap was "once again subject to the Court's injunction [in PCFFA III]."

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

A. The Whitecap Timber Sale Contract

Bid opening on the Whitecap timber sale was October 23, 1996 and the contract was awarded to us on October 31, 1996. The original termination date on the contract was March 31, 2002. Thus, the contract was originally to be in effect for over 65 months. Through both Market Related Contract Term Additions and a Contract Term Adjustment, the termination date was extended to November 30, 2007. As awarded, based on our cruise, the Whitecap timber sale contained an estimated volume of 6,064 mbf, of which approximately 97% was Douglas Fir. Based on our cruise, operational modifications made to the sale, and volume that was removed prior to the suspension, 3,973 mbf remained on the sale at the time of the suspension in 2000. The contract also required the reconstruction of approximately 10.23 miles of roads, with an original road completion date of June 30, 1998.

B. The Northwest Forest Plan and the Aquatic Conservation Strategy

In 1991, the Forest Service was enjoined by the U.S. District Court for the Western District of Washington for a series of environmental violations involving management of national forests within the geographic range of the Northern Spotted Owl. Similarly, in 1992, the Bureau of Land Management ("BLM") was enjoined by the District of Oregon for timber sales

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

affecting the Northern Spotted Owl. These and other decisions led to a joint effort by the Forest Service and BLM to develop a management plan for national forests and BLM districts within the range of the Northern Spotted Owl. The agencies published and received comments on both a draft and final supplemental environmental impact statement. On April 13, 1994, the Secretaries of Agriculture and Interior issued a Record of Decision ("ROD") selecting the ninth of ten options for this regional forest plan. This plan, known as the Northwest Forest Plan, was challenged and eventually upheld by the Ninth Circuit. Among other things, the ROD identified more than 400 "at risk" species and established four levels of survey and management requirements to protect these species.

The Aquatic Conservation Strategy (ACS) is a key component of the Northwest Forest Plan. It is a comprehensive plan designed to maintain and restore the ecological health of the waterways in the area covered by the Northwest Forest Plan. It addresses the habitat needs of salmonids on federal lands within the range of the Northern Spotted Owl. Among other things, the Northwest Forest Plan amends each LRMP and RMP (collectively referred to as "Forest Plans") for lands within the range of the Northern Spotted Owl to incorporate the ACS.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

C. Judge Rothstein's Decisions

Following the 1996 listing of the Umpqua cutthroat trout, one of the salmonid species addressed by ACS, as an endangered species under the ESA, the Forest Service and BLM requested formal consultation with NMFS pursuant to section 7 of the ESA regarding whether continued implementation of ten Forest Plans in the area covered by the Northwest Forest Plan would likely affect the Umpqua cutthroat trout. On March 18, 1997, NMFS issued a Programmatic Biological Opinion on the continued implementation of the existing forest plans in the entire western Oregon forest region. This Programmatic Biological Opinion determined that the continued implementation of the ten Forest Plans in question would not likely jeopardize the Umpqua cutthroat trout, nor would it likely jeopardize several other Pacific salmonid species that were proposed as threatened or were candidate species. In reaching this conclusion, NMFS expressly based its determination on the assumption that the Forest Service and BLM would implement site-specific projects in compliance with ACS and submit such projects for further site-specific consultation with NMFS.

The Programmatic Biological Opinion also endorsed a streamlined ESA consultation process for evaluating proposed site specific forest management activities that may affect

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

threatened or endangered species covered by the Programmatic Biological Opinion. This "streamlined" process was developed by the Forest Service, BLM (collectively, the "action agencies"), NMFS, and FWS (collectively the "regulatory agencies"), and involves interagency teams jointly participating in the ESA consultation process from project design, through submission of a biological assessment, to completion of the biological opinion.[3] The goal of this streamlined process appears to have been increased efficiency by having the action agencies and regulatory agencies working in conjunction from the outset, thereby reducing or eliminating communication issues as to what information provided by the action agency is needed by the regulatory agency for review. Most importantly, in light of the constant coordination between the action agencies and the regulatory agencies, for projects covered by the March 18, 1997 Programmatic Biological Opinion, NMFS agreed to make a no-jeopardy determination where the action agency complied with ACS.

In Pacific Coast Federation of Fishermen's Associations v. NMFS, No. 97-CV-775, 1998 WL 1988556 (W.D. Wash. 1998) ("PCFFA I"), six Oregon-based organizations brought suit

---

[3]Presumably, an interagency team reviewing a specific project would, at a minimum, include a biologist from the action agency proposing the project and a biologist from the regulatory agency that will conduct the consultation.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

against NMFS in the United States District Court for the Western District of Washington, claiming that the March 18, 1997 Programmatic Biological Opinion and three related site-specific biological opinions, all issued in accordance with the streamlined review process and making no-jeopardy determinations based on the Forest Service and BLM's compliance with the ACS strategy, violated the ESA. The Forest Service and BLM were added as defendants in the third amended complaint filed December 19, 1997. On April 29, 1998, Judge Rothstein of the Western District of Washington upheld the Programmatic Biological Opinion, finding that NMFS had not violated the ESA by equating a no-jeopardy determination with Forest Service or BLM compliance with the ACS.

However, the court nevertheless invalidated the site-specific biological opinions, holding that NMFS had failed to verify agency compliance with ACS on the project level. As the plaintiffs argued, although the biological opinions assumed the projects met ACS objectives, they did not provide mechanisms to ensure or verify actual compliance. The plaintiffs also argued that despite the fact that the information submitted to NMFS by the interagency review teams indicated adverse effects from the proposed projects, NMFS had not incorporated necessary constraints in the biological opinions, and therefore the ACS objectives were not met.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

The court agreed and held that NMFS could not rationally conclude that the 34 proposed timber sales addressed in the three site-specific biological opinions complied with ACS. The court's order of April 29, 1998 did not, however, actually enjoin the timber sales at issue. Although the environmental plaintiffs subsequently sought clarification of the order to include an injunction of the 34 sales, in an amended order dated May 29, 1998, the court declined to issue any injunctions on the timber sales, stating that the government agencies had already represented that the timber sales had been voluntarily halted.

In the second of the PCFFA cases, Pacific Coast Federation of Fishermen's Associations v. NMFS, 71 F. Supp.2d 1063 (W.D. Wash., No. C99-67R, 1999) ("PCFFA II"), the same six plaintiffs again challenged no-jeopardy biological opinions issued by NMFS as being inconsistent with ACS. In November and December 1998, NMFS issued four biological opinions which concluded that 24 proposed timber sales in the Umpqua River Basin would not jeopardize either the Umpqua cutthroat trout or the Oregon coast coho salmon. The biological opinions were issued following the same streamlined consultation process utilized in the Programmatic Biological Opinion upheld in PCFFA I. The sales at issue in PCFFA II included 12 of the sales from PCFFA I that had been submitted again for consultation after that decision.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

The plaintiffs in PCFFA II argued that the biological opinions at issue were inadequate for the same reason that the ones at issue in PCFFA I were, i.e., that they did not adequately ensure or verify that the Forest Service or BLM had complied with ACS on these projects. Once again, the court agreed with the plaintiffs, holding that NMFS had acted arbitrarily and capriciously by only assessing ACS compliance at the watershed level, by not evaluating short-term degradations, and by failing to incorporate watershed analysis consistently with the "best available science." Judge Rothstein granted summary judgment in favor of the plaintiffs, and vacated the four biological opinions on September 30, 1999.[4] On appeal, the Ninth Circuit upheld the lower court's decision on May 31, 2001. See Pacific Coast Federation of Fishermen's Associations v. NMFS, 265 F.3d 1028 (9th Cir. 2001).[5]

---

[4]As in PCFFA I, no injunctions of any timber sales were issued. In PCFFA II, however, the Forest Service and BLM were not parties so it is not clear the court would have had the power to enjoin their actions.

[5]As the Ninth Circuit noted, although the Umpqua cutthroat trout had been delisted by the time of its decision, the Oregon coastal coho salmon was still listed, and therefore the biological opinions at issue were still necessary. See PCFFA, 265 F.3d at 1031 n.1.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

In the third round of related cases, Pacific Coast Federation of Fishermen's Associations v. NMFS, Case No. C00-1757R ("PCFFA III"), the same six plaintiffs once again challenged NMFS for failing to comply with ACS. This action was filed while the appeal of PCFFA II was pending at the Ninth Circuit. The plaintiffs challenged 20 additional biological opinions covering approximately 170 timber sales, including the Whitecap contract. In a December 7, 2000 order, the court considered plaintiffs' motion for preliminary injunction and defendant's motion for stay. Both parties agreed that the issues in the instant case could be determined by the outcome of the appeal of PCFFA II.

That fact notwithstanding, on December 7, 2000, Judge Rothstein granted the plaintiffs' motion for preliminary injunction. The court held that because the 20 biological opinions had been issued under the same consultation strategy used in PCFFA II, which the court had already determined failed to ensure or verify agency compliance with ACS and therefore was arbitrary and capricious, the plaintiffs had a strong likelihood of success on the merits. In accordance with the preliminary injunction, NMFS was forced to suspend the 20 biological opinions at issue, including the biological opinion dated September 9, 1999 which covered the Whitecap timber

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

sale. Among other things, this in turn resulted in the Forest Service suspending the Whitecap timber sale contract on December 22, 2000, pending the outcome of the appeal in PCFFA II.

Following the Ninth Circuit's decision affirming the lower court's decision in PCFFA II, NMFS permanently withdrew the 20 biological opinions at issue on March 12, 2003, except with respect to a few particular sales for which the relevant opinions remained in effect. This withdrawal became part of a Stipulation and Order of the court, dated April 1, 2003, that granted judgment for the plaintiffs. In this stipulation, NMFS agreed that the plaintiffs were entitled to reasonable attorney's fees. In a letter dated March 23, 2004, the Forest Service lifted the suspension on the Whitecap timber sale, following the Ninth Circuit's February 24, 2004 opinion in Alsea Valley Alliance v. Dept. of Commerce, 358 F.3d 1181.[6]

---

[6]The Ninth Circuit held that the lower court's decision in Alsea Valley Alliance v. Evans, 161 F. Supp.2d 1154 (D. Or. 2001), was not appealable. The practical effect of this ruling was apparently to set aside the listing of the Oregon coast coho salmon, obviating the need for a biological opinion on the Whitecap sale, just as the same had briefly occurred immediately following the lower court's decision, leading to the brief lifting of the suspension of the Whitecap timber sale on December 12, 2001. The sale was suspended again on December 28, 2001 following the Ninth Circuit's December 14, 2001 order staying the lower court's decision upon emergency motion.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

D. The Forest Service's Liability to Swanson

Although the Whitecap timber sale contract contains clause CT6.01 (6/90), which purports to allow the Forest Service to suspend a purchaser's operations with limited liability in response to a court order, it is well-established that where, as here, the Forest Service's own failure to meet its environmental obligations causes the court order to be entered, the Forest Service has breached its duty to cooperate and not to hinder a purchaser's operations. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001); accord Superior Timber Co., Inc., IBCA No. 3459, 97-1 BCA ¶ 30,267 (contractual authority to suspend timber harvesting did not absolve the government of liability where its failure to comply with its environmental obligations was the cause of a court-ordered injunction of timber harvesting). The suspension of the Whitecap timber sale was caused by the court-ordered injunction necessitated by the failure of NMFS, working in tandem with the Forest Service, to meet its environmental obligations, as well as the Forest Service's own risky decision to nevertheless proceed with the Whitecap timber sale contract despite this failure. Because the Forest Service did not bargain for the contractual right to absolve itself from liability for court orders caused by improper government actions directly related to the sale, the Forest Service's suspension breached the Whitecap contract.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

Moreover, even assuming that the Forest Service had some authority to suspend our operations under clause CT6.01 in these circumstances (which it did not), the Forest Service also retained an obligation to implement the suspension reasonably. Precision Pine, 50 Fed. Cl. at 64 and cases cited therein. The Forest Service's suspension of our operations, which was imposed in December 2000 and was in place for over three years, was unquestionably an unreasonable amount of time. Thus, the Forest Service's ongoing and unreasonable suspension breached the Forest Service's implied contractual duties to cooperate and not to hinder our operations.

Additionally and in the alternative, the suspension contravened the warranty represented by CT6.25 (1/93) that, based on all information then reasonably available, the Forest Service had already taken and specified adequate measures to protect sensitive species when it designed the sale and put it out for bid.

E. Damages

As a result of the Forest Service's improper suspension/breach of contract, Swanson incurred the following damages for which it is entitled to compensation either pursuant to the terms of the Whitecap timber sale contract and/or as damages for the breach thereof.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

1. The increased direct cost of replacement timber.

In order to fill the substantial hole in its raw material supply created by the suspensions of the Whitecap and other federal sales, Swanson purchased a large parcel (35,719 mbf) of private timber known as the Kogap Tract in the fall of 1999. While on the whole the timber from the Kogap Tract was not ideally suited to Swanson's operations since it contained a substantial amount of material of inferior quality, it did also contain a fair amount of better quality timber. Indeed, the latter volume was critical to Swanson's maintaining production levels in its mills, i.e., without the purchase of timber from the Kogap Tract, Swanson would have had to substantially reduce production and possibly would have had to shut down one or more plants, thus incurring greater damages.

The Kogap Tract was harvested at an average delivered log cost (DLC) of $705.18 per mbf (see calculations set forth in Tab 1 of the attached material) whereas the anticipated DLC of the remaining 3,973 mbf of merchantable timber on Whitecap was $592.55 per mbf (see Tab 1). Thus, the difference between the DLC for merchantable timber from the Kogap Tract and that anticipated on Whitecap was, as reflected in Tab 1, $112.63 per mbf, or $447,478.99 for the entire volume remaining at the time of the suspension.

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

2. Loss due to lower quality of replacement timber.

Not only was the DLC for the timber from the Kogap Tract higher than that anticipated on Whitecap, but this higher DLC was also for timber of lesser quality (and therefore value) than that on Whitecap. That is, the anticipated average value of all merchantable timber remaining on Whitecap was $576.84 per mbf, whereas the average value of the timber on the Kogap Tract was only $549.42 per mbf, a difference of $27.42 per mbf. In order to properly calculate the cost of replacing the 3,973 mbf of suspended volume on Whitecap, this quality difference must be taken into account as has been done in Tab 2. The total difference with respect to the 3,973 mbf of timber from Whitecap that was replaced by lower quality timber from the Kogap tract was $108,939.66.

3. Loss from surplus Kogap timber.

Swanson was contractually required to harvest all the timber on the Kogap Tract. Therefore, in order to obtain the true cost to Swanson of the replacement timber from the Kogap Tract, the profit or loss from the timber that did not actually serve as replacement timber for any suspended federal timber sale (and therefore was only purchased as an inseparable part of the entire tract) must also be taken into account, in addition to the costs of replacement already

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

identified above. Swanson was forced to harvest this additional timber at a loss. As noted, the average cost of all timber removed from the Kogap Tract was $705.18, whereas the average value of that timber was only $549.42. As such, for the 7,493 mbf[7] of timber from the Kogap Tract that did not serve as replacement timber, Swanson experienced an actual loss of $155.76 per mbf, or a total loss of $1,167,109.68. Since the Kogap Tract would not have been purchased but for the suspension of numerous sales, this loss represents an actual cost of replacing the timber on those sales. We have calculated that the proportionate share of this cost attributable to Whitecap is $164,329.04. See Tab 3.

4. Cost of maintaining bonds during the suspension.

At the time of the suspensions, Swanson had a performance bond on the sale in the amount of $147,000. Pursuant to the calculation set out in Tab 4 of the enclosed damage materials, the cost of maintaining this bond through March 23, 2004 totals $2,605.19.

---

[7]The volume of the Kogap Tract (35,719 mbf) less the volume of all suspended sales that it replaced (28,226 mbf).

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

5. Swanson's cost of assembling it claim.

As set out in Tab 5, Swanson incurred $2,304.50 in having its personnel assist in the preparation of this claim. That amount is compensable pursuant to the terms of contract provision CT6.01.

6. Swanson's attorneys' fees and expenses incurred in assembling its claim.

As set out in Tab 6, Swanson incurred $60,419.71 in attorneys' fees and expenses for services rendered in the preparation of this claim. That amount is compensable pursuant to the terms of contract provision CT6.01.

CONCLUSION

For the reasons set forth above, we believe that we are entitled to $786,077.08.[8] To the extent that you disagree with all or any portion of our entitlement to this amount, we ask that you

[8]Please be advised that, in light of the Forest Service's material breach, we expressly reserve our rights to all remedies afforded the non-breaching party in the wake of a material breach. As such, any statements we have made either in the instant claim or elsewhere should be construed neither as an election to continue performance of the contract nor as an election to discontinue performance or in any other way repudiate the contract. Moreover, any actions we take, including harvesting, or any communication we make, etc., are done without prejudice to

**THE INFORMATION SET FORTH HEREIN AND ATTACHED HERETO CONTAINS CONFIDENTIAL INFORMATION AND TRADE SECRETS WHICH ARE PROPRIETARY TO THE SUBMITTER. NEITHER THIS SHEET NOR ANY INFORMATION SET FORTH HEREIN IS TO BE DISCLOSED IN ANY MANNER OR TO ANY EXTENT TO ANY PERSON OUTSIDE OF THE UNITED STATES GOVERNMENT WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE SUBMITTER. ANY DISCLOSURE WITHOUT SUCH CONSENT CONSTITUTES A VIOLATION OF 18 U.S.C. § 1905 OF THE UNITED STATES CRIMINAL CODE.**

issue a contracting officer's final decision pursuant to the Contract Disputes Act within 60 days of your receipt of this letter.

Sincerely yours,

SWANSON GROUP, INC.

Steve Swanson
President

Enclosures

---

our entitlement to the damages that we have suffered as a result of the Forest Service's suspension of the Whitecap timber sale contract, and without prejudice to our position that this suspension constitutes a material breach of contract and all rights that we have as a result of that material breach.

In this regard, should we harvest the timber on Whitecap and as a result find ourselves in a worse financial position than anticipated (as it appears very likely to be the case due to increased costs and/or decreased markets) our damages will increase accordingly.

**CERTIFICATION**

I certify that this claim is made in good faith, that the supporting data is accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which Swanson Group, Inc. believes the government is liable, and that I am duly authorized to certify this claim on behalf of Swanson Group, Inc.

Dated: 7/9/04

Steve Swanson
Steve Swanson, President
Swanson Group, Inc.