**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SWANSON GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-170C |
| | ) | consolidated with 05-171C |
| THE UNITED STATES, | ) | (Judge Smith) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY IN CONSOLIDATED CASE NO. 05-171C ("WHITECAP")**

Pursuant to Rule 56(a) of the Rules of the Court of Federal Claims, plaintiff, Swanson Group, Inc. ("Swanson"), respectfully submits the following Proposed Findings of Uncontroverted Fact in support of its Motion for Summary Judgment on the Issue of Liability in Consolidated Case No. 05-171C ("Whitecap").

1. On April 13, 1994, the Secretaries of Agriculture and Interior executed the "Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl" ("ROD"). Appendix to Plaintiff's Motion for Summary Judgment on the Issue of Liability ("P. App.") at 1-21.

2. The range of the northern spotted owl includes more than 24 million acres of federal lands within Northern California, Oregon and Washington. The federal lands are contained

within 19 National Forests that are managed by the U.S. Forest Service and seven Management Districts that are managed by the Bureau of Land Management ("BLM"). P. App. 5-6.

3. The Forest Service's and BLM's authority to manage federal lands is provided for by Congress in federal environmental laws, land management statutes and related regulations, including the Forest Service Organic Act, Multiple-Use Sustained Yield-Act, the Endangered Species Act, the Federal Land Policy and Management Act, the National Forest Management Act, and the National Environmental Policy Act. P. App. 9.

4. The ROD had been prepared and adopted against a backdrop of litigation, including three region-wide injunctions that had severely restricted new timber sale programs on federal forests within the range of the northern spotted owl for several years. P. App. 6.

5. The ROD put into place Alternative 9 (a/k/a "Option 9") of a range of alternatives that had been prepared by federal land management agencies for guiding the future management of federal lands within the range of the northern spotted owl. P. App. 5.

6. Among the goals of Option 9 as adopted in the ROD is to "provide for a steady supply of timber sales and non-timber resources that can be sustained over the long term without degrading the health of the forest or other environmental resources." P. App. 7-8. Under Option 9 some 78% of the federal lands within the range of the northern spotted owl, or 18.72 million acres, are entirely off-limits to traditional commercial timber harvest. P. App. 6.

7. By adopting Option 9 in the ROD, the Secretaries amended the planning documents for national forests within the range of the northern spotted owl, including the Umpqua National Forest within the state of Oregon, so as to bring those planning documents into compliance with Option 9. P. App. 16.

8. On July 27, 1995, President Clinton signed Public Law 104-19 "Making emergency supplemental appropriations for additional disaster assistance, for anti-terrorism initiatives, for assistance in the recovery from the tragedy that occurred at Oklahoma City, and making rescissions for the fiscal year ending September 30, 1995, and for other purposes" (the "Rescissions Act"). P. App. 24-31 (§ 2001 of the Rescissions Act).

9. Section 2001(d) of the Rescissions Act provides:

> (d) DIRECTION TO COMPLETE TIMBER SALES ON LANDS COVERED BY OPTION 9 – Notwithstanding any other law (including a law under the authority of which any judicial order may be outstanding on or after the date of the enactment of this Act), the Secretary concerned shall expeditiously prepare, offer and award timber sale contracts on Federal lands described in the [ROD].

P. App. 28.

10. Section (i) of the Rescissions Acts further provides that:

> (i) EFFECT ON OTHER LAWS – The documents and procedures required by this section for the preparation, advertisement, offering, awarding, and operation of . . . any timber sale under section (d) shall be deemed to satisfy the requirements of the following applicable Federal laws (and regulations implementing such laws):
>
> > (1) The Forest and Rangeland Renewable Resources Planning Act of 1974 (43 U.S.C. § 1600, *et seq.*).

(2) The Federal Land Policy Management Act of 1976 (43 U.S.C. § 1701, *et seq.*).

(3) The National Environmental Policy Act of 1969 (42 U.S.C. § 4321, *et seq.*).

(4) The Endangered Species Act of 1973 (16 U.S.C. § 1531, *et seq.*).

(5) The National Forest Management Act of 1976 (16 U.S.C. § 472a, *et seq.*).

(6) Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. § 528, *et seq.*).

(7) Any compact, executive agreement, convention, treaty, and international agreement and implementing legislation related thereto.

(8) All other applicable Federal environmental and natural resource laws.

P. App. 30.

11. Subsection (f)(1) of the Rescissions Act further mandated that <u>any</u> legal challenge to Option 9 timber sales other than under federal environmental and natural resource management laws had to be filed in the U.S. District Court for the district where the subject federal lands are located within 15 days of the advertisement of the sale. P. App. 28.

12. The Forest Service's ability to offer timber sales under the provisions of the Rescissions Act expired on December 31, 1996, however, the Act provided that its terms and conditions "shall continue in effect with respect to . . . timber sale contracts offered under subsection (d) until the completion of performance of the contracts." P. App. 30.

13. The House Managers' Conference Report for the Rescissions Act states:

OPTION 9

> The managers have retained bill language added by the Senate that provides the Forest Service and Bureau of Land Management the authority to expedite timber sales allowed under the President's forest plan for the Pacific Northwest, commonly known as option 9. The managers are concerned that the administration has not made the necessary efforts to fulfill the commitment it made to the people of the region to achieve an annual harvest level of 1.1 billion board feet and have included bill language to assist the administration in this effort.

P. App. 33-35.

14. The House Managers' Conference Report also observes that:

> For . . . Option 9 [timber sales] . . . the bill contains language which deems sufficient the documentation on which the sales are based, and significantly expedites legal actions and virtually eliminates dilatory legal challenges. Environmental documentation, analysis, testimony, and studies concerning each of these areas is exhaustive and the sufficiency language is provided so that sales can proceed.

P. App. 34.

15. On May 16, 1996, the Forest Service sent a letter to interested parties advising them that the Forest Service had completed the Environmental Analysis for the Whitecap sale in order to provide the public "with an opportunity to comment on this proposal prior to [the Forest Service's] final decision." The letter also stated that "The Whitecap Timber Sale is subject to Public Law 104-19 (1995 Rescission Act). This means that the decision for this project cannot be appealed." P. App. 36.

16. On June 28, 1996, the Forest Supervisor for the Umpqua National Forest signed the Decision Notice and Finding of No Significant Impact for the Whitecap timber sale. P. App. 37-41. That document provides that:

> This decision for the Whitecap Timber Sale is located on lands covered by Option 9 of the "Record of Decision for Amendment to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl." Under provisions of subsection (e) of Public Law 104-19 [the Rescissions Act], this decision is not subject to appeal as described in regulations at 36 CFR 215.
>
> This decision is subject to judicial review only in the United States district court for the district in which the affected Federal lands are located. As required under Section (f)(1) of Public Law 104-19, any challenge to this project must be filed in the district court within 15 days after advertisement of the sale.

P. App. 41.

17. On July 31, 1996, the Court of Appeals for the Ninth Circuit, the jurisdiction of which includes all National Forests in the State of Oregon, affirmed a ruling of the Oregon district court interpreting the provisions of the Rescission Act, as follows:

> The Rescissions Act doesn't require any documents or procedures for Option 9 timber sales. The effect of subsection 2001(i), therefore, is to render sufficient under the environmental laws whatever documents and procedures, if any, the agency elects to use for an Option 9 sale. The upshot is that, under Rescissions Act §§ 2001(d) and 2001(i), defendants' decision to proceed with the [sales], and all documents and procedures connected with those sales, were entirely consistent with all federal environmental and natural resource laws.

Oregon Natural Resources Council v. Thomas, 92 F.3d 792, 796 (9th Cir. 1996) (emphasis supplied); P. App. 42-49.

18. On September 20, 1996, the Forest Service placed an advertisement soliciting sealed bids for the Whitecap timber sale contract on the Umpqua National Forest within the State of Oregon. P. App. 50; P. App. 51. The bids were to be opened on October 23, 1996, and followed immediately thereafter by oral bidding for the Whitecap contract.

19. The advertisement for the Whitecap timber sale notified the public that "This timber sale is governed by section 2001 of Public Law 104-19 [i.e., the Rescissions Act], which requires any legal challenge of this timber sale to be filed within 15 days of this advertisement." P. App. 50.

20. No legal challenge to the Whitecap sale was filed within the allotted 15-day time period and the bid opening took place as scheduled on October 23, 1996. See P. App. 55-57.

21. On October 23, 1996, Swanson, which at that time was known as Superior Lumber Co., submitted a sealed bid for the Whitecap timber sale. P. App. 55.

22. The Forest Service opened the bids it had received for the Whitecap timber sale contract on October 23, 1996, and thereafter conducted oral bidding for the contract. See P. App. 58-61.

23. Swanson was the high bidder on the Whitecap contract. P. App. 55.

24. On October 31, 1996, the Forest Service awarded the Whitecap timber sale, Contract No. 086931, to Swanson. P. App. 55-56.

25. Pursuant to the terms of the Whitecap contract, the Forest Service agreed to sell and permit the purchaser to cut and remove all Included timber identified in the contract. P. App. 62.

26. On December 7, 2000, the U.S. District Court for the Western District of Washington in Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Service, No. C00-

175, enjoined 20 Biological Opinions that had been prepared by the National Marine Fisheries Service in consultation with the Forest Service and Bureau of Land Management under the Endangered Species Act which assessed the effects of numerous timber sales located across the Pacific Northwest on the Oregon coastal coho salmon, among other species listed under the ESA. P. App. 65-74. The December 7, 2000 injunction expanded the scope of an earlier injunction that had been issued by the same district court with respect to several other Biological Opinions that did not comply with the ESA and which was then pending on appeal at the Ninth Circuit. Id.

27. In the wake of the December 7, 2000 ruling, the Regional Foresters for Region 5 (California) and Region 6 (Washington and Oregon) issued a joint letter on December 19, 2000 to Forest Supervisors for forests subject to the Northwest Forest Plan advising them of the ruling and directing them to suspend active operations under contract clause C6.01(b) and further directing the Forest Supervisors to notify timber contract purchasers, including the purchaser of Whitecap, of the ruling. P. App. 75-76.

28. The government has provided interrogatory responses in the instant case stating that the Forest Service's suspension of Swanson's operation was imposed under Contract Clause CT6.01(b), i.e., as a result of an order of the District Court for the Western District of Washington. P. App. 77-80.

29. By letter dated December 22, 2000, the Forest Service Contracting Officer for the Whitecap sale notified Swanson that 20 Biological Opinions had been enjoined under the

December 7, 2000 ruling, including the Biological Opinion for the Whitecap sale. P. App. 81. As a result, the Whitecap sale was suspended during the entire 2001 harvest season.

30. On September 5, 2001, the Ninth Circuit Court of Appeals issued its opinion in Pacific Coast Federation of Fishermen's Ass'ns, Inc. v. National Marine Fisheries Service, 265 F.3d 1028 (9th Cir. 2001), which affirmed the Washington district court's determination that biological opinions issued for certain timber sales had not demonstrated that the sales would not jeopardize the continued existence of certain species listed under the Endangered Species Act.

31. On December 12, 2001, the Contracting Officer advised Swanson that the Oregon district court had issued an order setting aside the listing of the Oregon coast coho salmon under the Endangered Species Act and, therefore, the Whitecap sale was no longer suspended. Alsea Valley Alliance v. Evans, 161 F. Supp.2d 1154, 1163 (D. Or. 2001); P. App. 82.

32. Two days later, on or about December 14, 2001, the Ninth Circuit Court of Appeals issued a stay of the Oregon district court's order that had found the listing of the Oregon coast coho salmon under the Endangered Species Act to have been unlawful. See P. App. 83; see also Alsea Valley Alliance v. Dept. of Commerce, 358 F.3d 1181 (9th Cir. 2004). On or about December 17, 2001, Peggy Kain in Region 6 of the Forest Service advised Forest Service employees, including the Contracting Officer for the Whitecap sale, that in light of the stay the Forest Service considered the coho salmon to be listed under the Endangered Species Act and that awarded sales should once again be suspended. P. App. 83.

33. Following this direction from the Regional Office, the Contracting Officer for the Whitecap sale issued a letter dated December 28, 2001 to Swanson advising that the suspension of the Whitecap sale remained in place. P. App. 84. This suspension remained in effect throughout the 2002 and 2003 harvest seasons.

34. On February 24, 2004, the Ninth Circuit Court of Appeals dissolved its stay of the Oregon district court's order that the listing of the Oregon coast coho salmon had been unlawful. See P. App. 87-89; see also P. App. 85-87.

35. In an e-mail dated February 25, 2004, the litigation coordinator for Region 6 of the Forest Service advised Forest Service employees of the Ninth Circuit's ruling lifting the stay of the district court's ruling finding that the listing of the Oregon coast coho salmon had been unlawful. The litigation coordinator advised that:

> The Oregon coast coho listing affected parts of the Umpqua, Siuslaw, and Siskiyou Forest. These Forests may want to review any sales that may have been encumbered by the [sic] either by the 1998 listing or the 9th Circuit stay.

P. App. 89.

36. On March 23, 2004, the Contracting Officer for the Whitecap sale confirmed with Peggy Kain in the Regional Office that Whitecap, among other affected sales, should be released from the suspension. P. App. 85 (handwritten memorandum, initialed "BW"). That same day the Contracting Officer sent a letter advising Swanson that operations could proceed on the Whitecap timber sale. P. App. 90.

37. By letter dated April 26, 2004, the Contracting Officer granted Swanson additional time within in which to complete the contract due to time lost during the Forest Service's suspension of operations. P. App. 91.

38. By letter dated June 1, 2004, Swanson accepted the additional time to operate the contract to which it was entitled due to the suspension, but expressly reiterated its view that the suspension had been a material breach of contract and again noted that any actions taken by it under the contract were without prejudice to its position that the suspension had been a material breach of contract. P. App. 92.

39. With the limited exception of the period between December 12, 2001 to December 28, 2001, cutting timber on the Whitecap timber sale remained suspended by the Forest Service from December 22, 2000 to at least March 23, 2004. See P. App. 91.

40. As a direct result of the Forest Service's suspension, Swanson was denied the opportunity to cut the timber from the Whitecap sale during the suspension and Swanson consequently incurred damages and additional costs including additional bond costs and the cost of obtaining replacement timber. See P. App. 93-112.

Respectfully submitted,

s/Gary G. Stevens
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

Of Counsel:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 22, 2006